181 Cal.App.4th 282 (2009)
104 Cal.Rptr.3d 247
In re Z.N. et al., Persons Coming Under the Juvenile Court Law.
SAN FRANCISCO HUMAN SERVICES AGENCY, Plaintiff and Respondent,
v.
S.J., Defendant and Appellant.
No. A124843.
Court of Appeals of California, First District, Division Two.
December 29, 2009.
*285 Justine S. Juson, under appointment by the Court of Appeal, for Defendant and Appellant.
Dennis J. Herrera, City Attorney, and Kimiko Burton, Deputy City Attorney, for Plaintiff and Respondent.
No appearance for Minors.

OPINION
LAMBDEN, J.
S.J. (mother) appeals from orders terminating her parental rights over seven-year-old twins Z.N. and Za.N., and selecting adoption as their permanent plan after a hearing under Welfare and Institutions Code section 366.26.[1] She does not challenge the merits of the rulings but claims reversible error in (1) denials of motions, late in the hearing, to relieve and substitute counsel, and (2) failure to comply with notice mandates of the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.). We affirm the orders.

BACKGROUND
Mother has five children: the twins (born in Apr. 2002), their half siblings L. and Dexter M. (born in 1995 and 1992), and another half sibling, Benjamin J. (born in 1994). All but Benjamin were in mother's custody when *286 removed and detained in November 2006 on information that she was incarcerated and, during months of being homeless before then, had left them in the care of others.
The San Francisco Human Services Agency (HSA) filed an original petition that same month, and the twins were eventually declared wards (§ 300, subds. (b) [failure to protect], (g) [no provision for support] & (j) [abuse of sibling]) on amended allegations regarding mother that she was on felony probation for grand theft and was convicted of battery on a police officer; she was under investigation for welfare fraud in receiving aid in more than one county for Benjamin; she had a history of domestic violence, with incidents witnessed by the children; her transience left her unable to meet the children's medical, dental, educational and emotional needs; she was currently incarcerated for a probation violation, her second incarceration since an arrest on a warrant in November 2006 for noncompliance with community service; half siblings Dexter and L. and Benjamin were subjects of pending dependency petitions; mother had refused to reveal the location of Benjamin so that a health and safety evaluation could be done; mother continued to conceal the whereabouts of Benjamin, who had not been seen since he was six months old; and mother had given conflicting accounts of his whereabouts, telling family members that he lived with his father, telling HSA that he was voluntarily placed with a paternal aunt, and saying he had been with an unidentified family since he was very young.
The twins entered foster care immediately, in November 2006, with a family that mother chose. They remained together in the same home throughout these proceedings, bonded quickly and made great progress, transforming from children with emotional problems to children who thrived physically, emotionally and socially, and excelled academically. By the time of the proceedings we review here, nearly two and a half years later, the foster parents were committed to adopting and were completing a home study.
Mother's progress was dismal throughout the reunification period. She signed an initial services plan in December 2006, while jailed three months for an underlying grand theft, and was granted reunification services at disposition in June 2007. Mother was represented by counsel throughout but did not personally attend a hearing until September 2008 (nearly two years into the case), electing not to attend early hearings because she knew she was being criminally investigated for welfare fraud related to Benjamin, whose whereabouts she continued not to reveal.
Mother was also incarcerated for most of that time. The record is confusing, but it appears that in March 2007, just a month after her time in San Mateo and San Francisco County jails for the grand theft, she was jailed in *287 San Francisco for child concealment. In the criminal matter, she ultimately pled guilty to welfare and food stamp fraud (§ 10980, subd. (c)(2)), for collecting on the absent Benjamin in two counties, and perjury and child concealment (Pen. Code, §§ 118, 278.5), in return for a two-year prison sentence. She was jailed in San Francisco until February 2008, when she was transferred to state prison and served out a further six months until released in mid-August 2008. She had a period of weekly visits with the twins in the brief interval between jailings, then twice-monthly visits part of the time while in jail the second time. She declined to have visits while in prison, but sent them some letters.
Meanwhile, mother's reunification services were terminated in June 2008, over 18 months after removal, for lack of substantial progress. We do not have full records for the half siblings, but by the start of the twins' section 366.26 hearing in March 2009, Dexter (age 17) was in long-term foster care, and L. (age 13) was with her father, her case having been dismissed. The whereabouts of Benjamin (age 14) were never ascertained. The twins' presumed father (who has not appealed here) was not a part of the twins' lives when the case began and had not been in contact with them, or HSA, since January 2008.
Within a week of her parole release from state prison in August 2008, mother took up residence at a Walden House facility on Treasure Island, participating in a 15-month programFemale Offender Treatment and Employment Program (FOTEP)designed to ready her for employment and independence. She was nearly seven months through that program by the time of the section 366.26 hearing, had successfully completed various classes, was working at an internship at the San Francisco County Jail, and felt she was in compliance with parole. She did not have permanent housing but had applied for it, and her housing would allow children. Her release from FOTEP was set for September 2009, six months off.
The court had suspended mother's visits with the twins upon terminating services and setting a section 366.26 hearing, and HSA thereafter consistently recommended terminating parental rights and choosing adoption as the permanent plan.
In early January 2009, mother's counsel filed a modification petition (§ 388) to reinstate visits and reunification services based on mother's progress in FOTEP and earlier history of positive visits with the twins while jailed in San Francisco. HSA filed opposition, and the matter was heard on March 13, 2009, the first day of the section 366.26 hearing. Mother's counsel presented the petition first, calling social worker Tomy Joseph, FOTEP case manager Avonelle Hanley-Mills, and mother as witnesses. Counsel's effort to *288 present the director of a prerelease program was met with a successful objection that the witness was not timely designated. The court denied modification, citing lack of evidence that it was in the children's best interest.
Moving on to the section 366.26 matters, the court excluded the views of half sibling Dexter for lack of standing (see § 388, subd. (b)). His counsel related that Dexter did not want to come to court, and mother's counsel related that she had chosen not to force his appearance by subpoena, thinking that his counsel could relate his views. Counsel sought a continuance, and the court granted it after HSA had briefly recalled Tomy Joseph to the stand.
At the start of the continued hearing, on April 27, 2009, mother's counsel raised a "McKenzie motion" to be relieved as counsel (People v. McKenzie (1983) 34 Cal.3d 616 [194 Cal.Rptr. 462, 668 P.2d 769]), while mother raised a "Marsden motion" to change counsel (People v. Marsden (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]). The court cleared the courtroom and heard each movant relate, in essence, that their relationship had deteriorated to the point that they could no longer communicate effectively. The court denied both motions, citing in part the lateness of the request and the children's need for resolution. Mother left the courtroom for the rest of the hearing. Her counsel cross-examined the caseworker and, there being no further witnesses or evidence, urged long-term foster care based on a claimed sibling-relationship exception (§ 366.26, subd. (c)(1)(B)(v)). The court terminated the rights of both parents and selected adoption as the plan.
The absence of challenge to the merits of the section 388 or 366.26 rulings on this appeal leaves no need to detail the evidence, but we note that mother insisted on a story of Benjamin's absence that differed from prior explanations she had given to family (who had not seen Benjamin since infancy) and to officials. She now said that she had let Benjamin stay with a man in Hunter's Point named Richard Anderson, someone she had been "dating or seeing" but who she did not believe was Benjamin's biological father. Benjamin had now lived with Anderson since 1995, and mother had not seen them since late 1998 or early 1999. She had no idea where he was or whether he was safe or alive.

DISCUSSION

I. "Marsden"/"McKenzie" ruling

Mother contends that denial of her Marsden/McKenzie motions was an abuse of discretion that denied her due process and rose to "structural error" in the circumstances, such that reversal is required without any need to establish prejudice. We note that she defines a "McKenzie motion" as one "by *289 appellant or his counsel to request the removal of counsel[] (People v. McKenzie[, supra,] 34 Cal.3d [at p.] 631)," yet she does not offer any analysis distinct from Marsden review. Since review of a "McKenzie motion" ruling is similar (e.g., People v. McDade (1991) 230 Cal.App.3d 118, 125-126 [280 Cal.Rptr. 912] [reviewing for abuse of discretion]), we proceed with Marsden review as briefed by the parties. They agree that Marsden principles, forged in the criminal law context, apply by analogy to dependency proceedings. (In re James S. (1991) 227 Cal.App.3d 930, 935, fn. 13 [278 Cal.Rptr. 295].)
The motions were based on these oral exchanges between the court, mother, and her counsel, Nina Bhutani: "THE COURT: . . . Ms. Bhutani, you are asking that you be given leave to withdraw from the case?
"MS. BHUTANI: Yes.
"THE COURT: Can you tell the court why?
"MS. BHUTANI: Well, I first of all have had the case for three years, and . . . I think it's fair to say that my client and I cannot speak to each other. We do not get along. Our communication has severely broken down, as our body language reflects. I cannot represent [mother] anymore.
"I realize where we are at this stage of the proceedings.
"I find, as I am sure she does, her messages are not appropriate, sometimes threatening. I cannot do it anymore. And . . . we have no attorney-client relationship.
"In the meantime of me coming to this conclusion after last week and this morning, I did advise the parties. I also had a conversation with Mr. Blumberg in order to expedite the process, who is backup in here right now. If I was relieved I am prepared to hand him the file. He said if he is appointed he is prepared to take it. And I think it would be beneficial in case of appeal, and also beneficial for [mother] to have a new lawyer even at this juncture, because I think we are both just over each other at this point.
"THE COURT: Ma'am?
"THE MOTHER: I concur. When we were hereand I first want to say, Your Honor, that this for me is not a ploy to put this .26 hearing off.
"I have been very frustrated with Ms. Bhutani almost from the beginning. I was incarcerated in San Francisco County Jail from June 2007 to February *290 2008 before I was transported to CDC. Only one time did she come to see me. It was impossible to reach her by phone. There was a high toll block on her telephone. And a couple of times when I did speak to her it was through three-way calls, and I would tell her how frustrated, I never knew what was going on in this courtroom, what was going on with my kids.
"At the hearing on the 13th in this courtroom the city attorney made references to that I wasn't here in court, I wasn't present in court during my incarceration. I have always asked to be transported.
"I neverit was just very frustrating dealing with Ms. Bhutani. Even my criminal court lawyer, she also wrote a statement that I have here about how frustrating and how she had called Ms. Bhutani on my behalf numerous times, her interns, Friend Outside Program left massages for Ms. Bhutani, never to any avail.
"My criminal case judge[,] Carol Yaggy[,] had to contact Ms. Bhutani to order her to come and see me.
"You know, just, and even since I have been out, Your Honor, I have asked things of her. We have never sat down and gone over this case. She's made comments.
"I have asked, you know, I even contacted some of the other contacts that I wanted to fire Ms. Bhutani as my attorney.
"So it's not like we are here and now I am trying to do this to delay, because I know what is going to happen and I am making piece [sic] with that, but I just think that her behavior has been atrocious and no person going through this situation should be treated like this. And I sit in courtrooms and I talk to lawyers every day in my position as a case manager, and this has just been unbelievable, I mean really unbelievable.
"I have asked for documents, I have asked for things, I don't get them. You know, the 388, I have been asking her to file that from almost the time that I first got out. You know, I am going to the courthouse on Friday, I will be there on Friday and I come down here Mondays and Tuesdays, and I check, nothing has been filed. It's been one thing, Your Honor, after another.
"THE COURT: This is the 388 that was filed in January you are referring to?
"THE MOTHER: Yes, Your Honor. I have been asking her to file that for months, for months. And I was released in August of 2008.
*291 "Regardless of what the outcome is, if the city attorney doesn't agree, whoever doesn't agree, I say take it to the judge, that is my right, take it to the judge, and it took all the way until then and even then it wasn't served properly. And I asked if we can get in here before March, you know, `Okay, I am going to file it, I am going to refile it.' I called every day. At one point I would call her office, I would call her cell phone every day. It was like a routine when I would get to the office, it was like one of the first things I would do. No return phone calls, Your Honor, absolutely nothing.
"And yes, some of my messages have gotten, I don't believe threatening, she may perceive it as threatening. But what is it going to take for you to call me back? Do I need to go sit on your stairs to call me back?
"These are my children, and irregardless [sic] of what the court may think of me, I love my kids and I have been prepared to fight, you know.
"MS. BHUTANI: Your Honor, I am not going to respond to most of that, even though I would. I just don't feel it's appropriate at this point because the case is before you.
"I do feel bad that [mother] feels that way. I think in the beginning with Ms. Epley and all the things that were going on, we had a good relationship, but after three years it has deteriorated.
"THE MOTHER: It's been two years, six months.
"MS. BHUTANI: Okay. I agree at this point that there is no way we can work together, even through the remainder of this hearing.
"THE COURT: Just a couple of things I'd like to point out to [mother], and that is kind of obvious maybe.
"The first thing is that just because you want your lawyer to do something doesn't mean that it's the best thing to happen right then. So when the 388 petition got filed . . . was a matter of legal judgment and not a matter of not doing what you want. Sometimes underlying a lot of these motions by parents to get rid of their lawyers is he or she doesn't do what I tell them to do.
"THE MOTHER. I understand that.
"THE COURT: That is not their role to do what you tell them to do.
"THE MOTHER. And I understand that.
*292 "THE COURT: So just keep that in mind that maybe your complaints about the 388, there might be something else behind that.
"Secondly, I understand that you are frustrated when you say you didn't get calls back in the beginning, but generally calling somebody every day doesn't help.
"And the last thing I am going to say is for the times that you were not in court, . . . I think I can say with a lot of clarity that Ms. Bhutani fought for you like a tiger. She came in here and she made excuses for you and she made arguments for you and she put herself out there for you, understanding that her job was not made much easier because of the reason you were in jail in the first place. So you need to know that even though you may not have observed a lot of what was going on here, it was happening.
"THE MOTHER. And I understand that, Your Honor. But there was absolutely no communication, letters when I was incarcerated, I mean to even state what happened in court. The only thing I knew is I had a court date and I wasn't transported. What was the outcome I have absolutely no idea, absolutely no idea.
"And I am not saying, you know, that
"THE COURT: Okay, . . . if your main complaint at this point is that you were not having communication with Ms. Bhutani, we can fix that.
"THE MOTHER. Okay.
"THE COURT: I also need to tell you that there isn't anybody on this panel of attorneys who is going to fight any harder for you. And there isn't anybody on this panel who is going to do what you say because you want to do it. I need to disabuse you of that idea if that is something that you were holding close.
"THE MOTHER. I mean that is the final. It's been two years and six months, you know, with this, Your Honor. And no preparation, absolutely nothing, even before the 388 she had never really had a conversation with any of the witnesses, even with myself. I had no idea. I walked into this situation completely blind, no nothing, not a meeting, not a sit-down, not a come to my office. I invited her to come to the island, there was a space available, she got lost or something. Nothing.
*293 "MS. BHUTANI: No, I came to the island. I am shutting up."[2]
After ascertaining that mother had nothing further to say, the court ruled: "It's the day of the [.]26. I don't think these children should have to wait any longer. I think I need to hear the evidence and make the decision today.
"If you wish, the two of you, to renew your motion at some time in the near future, you certainly may. But for today the Marsden motion is denied and the McKenzie motion is denied.
"And I would really like to say one more thing to both of you, and that is you have a long-term working relationship. It's on the rocks right now clearly from both of you. If this can be solved by a little more returning of phone calls or returning of letters or face-to-face meetings on your part, Ms. Bhutani; and on your part, [mother], if you would stop using intemperate language that can be perceived as threatening, if you can stop calling every single dayma'am, you can't talk and listen at the same time, and right now I desperately need you to listen because there is so much at stake.
"If after today and after you have had a chance to work on your relationship and you think it still wouldn't work out, you come back and see me. But I am not going to grant this on the day of trial." The court then added, after unreported discussion: "We are back on the record. The court has denied counsel's McKenzie motion and mother's Marsden motion. Both motions are denied without prejudice, and I am prepared to go forward now. [¶] And [mother] is not present in the courtroom. I believe counsel told us off the record that mother prefers to not be in the courtroom." The court then proceeded with a further five transcript pages of examination of social worker Tomy Joseph (last name legally changed to Pazhempallil since the last hearing date). This consisted principally of cross-examination on mother's behalf by Bhutani. All sides then rested, without further witnesses, and Bhutani vigorously argued, without success, for long-term foster care rather than terminating parental rights and choosing adoption as the children's plan.
(1) "When a defendant seeks new counsel on the basis that [her] appointed counsel is providing inadequate representationi.e., makes what is commonly called a Marsden motion (People v. Marsden[, supra,] 2 Cal.3d 118 . . .)the trial court must permit the defendant to explain the basis of [her] contention and to relate specific instances of inadequate performance. A defendant is entitled to relief if the record clearly shows that the appointed *294 counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result. Substitution of counsel lies within the court's discretion. The court does not abuse its discretion in denying the motion unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel. [Citation.]" (People v. Smith (2003) 30 Cal.4th 581, 604 [134 Cal.Rptr.2d 1, 68 P.3d 302].)
(2) On review, we consider (1) the timeliness of the motion, (2) the adequacy of the court's inquiry into the defendant's complaint, and (3) whether the conflict was so great that it resulted in a total lack of communication preventing an adequate defense. (People v. Smith, supra, 30 Cal.4th at pp. 606-607.) On factor (1): "`It is within the trial court's discretion to deny a motion to substitute made on the eve of trial where substitution would require a continuance.' [Citation.] This is even more true if the motion is made during trial." (Id. at p. 607.) On factor (2), inquiry is adequate if it allows the defendant to express herself fullyi.e., as comprehensively as the circumstances reasonably permit. (Ibid.) On factor (3), and even where the defendant refuses to cooperate with counsel or participate further in trial after the denial of substitution, there is no abuse of discretion where the reason for a complete breakdown "`was the voluntary conduct of defendant, not any failure by the trial court to adequately inquire into the reasons for the conflict.' [Citation.]" (Ibid.)
Factor (1) supported denial. The motion came not only during the hearing contest, but in the final half-hour or so of a hearing continued from a month earlier. Bhutani had another attorney (Blumberg) standing by to "take" the file if appointed in Bhutani's stead, but the record does not show that Blumberg was ready to proceed without a continuance. Factor (2) also supported the denial. We have set out the court's extensive inquiry into the reasons of client and counsel, and mother makes no argument at all that the inquiry was inadequate. Nor does she convincingly argue that Bhutani rendered ineffective assistance in the legal work she did in the case. The trial court in fact praised Bhutani for vigorous advocacy in a case made difficult by mother's conduct. There is no reason to think that the two instances mother cites on appeal (without having mentioned them on the motion below) would have dissuaded the judge of that assessment overall.[3]
*295 That leaves factor (3), whether there was a conflict so great that it resulted in a total lack of communication preventing an adequate defense. (People v. Smith, supra, 30 Cal.4th at pp. 606-607.) Necessary subparts are (a) a complete lack of communication (b) not caused by the voluntary conduct of the client that would (c) prevent an adequate defense. (Ibid.) The court found that "a long-term working relationship" was clearly "on the rocks right now" but held out hope that it was remediable, denying the motions without prejudice to renew if there was no improvement. That hope, as the court surely appreciated, did not cure the problem for the brief remainder of the hearing, but the court was obligated to look further to whether this was due to mother's conduct and whether the breakdown would prevent an adequate defense for the remainder of the hearing.
The court appeared to fault both counsel and client for the communication breakdowncounsel for being less responsive than she could have been, and mother for expecting too much control, making too frequent demands, and using intemperate or threatening language. Thus the court did fault mother's voluntary conduct, at least in part, which works in favor of the denial.
The court did not speak directly to the question of the breakdown preventing an adequate defense, but did praise Bhutani's work on mother's behalf. This included her advocacy on the section 388 relief sought at the last hearing. The court could reasonably infer that loss of that motion had contributed to the recent breakdown, as counsel and client realized that, without resumed reunification services, there was little hope of halting the recommended plan of adoption for the twins and concomitant termination of parental rights, given the twins' longtime security and success in a preadoptive home and that mother's services had been terminated for over a year. The question for the court was whether the breakdown would now prevent a defense on those questions, and the appellate record supports an implied conclusion that it would not. Most of the evidence had been presented at the last hearing, when the attorney-client relationship was perhaps strained, but still intact. The parties had explored the reports, and examined their author, and examined mother herself, evidence that overlapped the plan and parental-rights questions. There is no indication that mother expected to testify further and that the denial of the McKenzie/Marsden motions affected any such strategy.
(3) No abuse of discretion appears in denying substitution and proceeding with the rest of the hearing. Even if we found abuse, we would not reverse. While this was the point where parental rights would finally be severed, we *296 reject mother's arguments that any error at that point was "structural" and requires automatic reversal. Mother's cited cases are easily distinguished. (E.g., In re Jasmine G. (2005) 127 Cal.App.4th 1109, 1116 [26 Cal.Rptr.3d 394] [failure to give notice of selection and implementation hearing]; but see In re James F. (2008) 42 Cal.4th 901, 915 [70 Cal.Rptr.3d 358, 174 P.3d 180] [cautioning against importation of structural error ideas into dependency proceedings], 918 [denial of notice and a hearing may be harmless where the outcome of the proceeding has not been affected].) With the termination of reunification services a year earlier, the focus had shifted to the needs of the children for stability and permanency (In re Marilyn H. (1993) 5 Cal.4th 295, 309-310 [19 Cal.Rptr.2d 544, 851 P.2d 826]), and the brief absence of an attorney-client relationship here was not a total deprivation of the right to counsel (cf. Gideon v. Wainwright (1963) 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792]). The ultimate breakdown was not until a week before the continued hearing, when all that remained was some further examination of a social worker, plus legal argument. After the court denied mother's McKenzie/Marsden motions, Bhutani cross-examined the social worker and presented valiant argument that a beneficial-interest exception made long-term guardianship and continued parental rights the better solution. Any error was not structural.
For many of the same considerations, we would find no prejudice, even by the heightened federal constitutional standard of harmless beyond a reasonable doubt. We see no record suggestions that anything would have gone more favorably for mother had the court granted the McKenzie/Marsden motions.

II. ICWA Issues

Mother's claim of ICWA error is based on a lack of tribal notice compliance on the face of the record on this appeal. HSA argues that mother forfeited the issue by not raising it below, that to enforce notice requirements at this late stage would violate the twins' constitutional rights to permanence and stability, that the information before the court was too vague to trigger a need for tribal notice, and that if notice was required, we should take judicial notice of ICWA efforts in two of the half siblings' cases as showing substantial compliance here. Mother resists each of HSA's arguments, and we find it appropriate to group the issues into (a) compliance, (b) judicial notice, and (c) prejudice.
A. Compliance. We reject HSA's view that mother's failure to raise the issue below bars the issue on appeal. We acknowledge a split of authority on the question but adhere to cases reasoning that because notice serves the interests of Indian tribes, failure to give tribal notice is not an issue forfeited *297 by a parent's failure to object. (In re Robert A. (2007) 147 Cal.App.4th 982, 989 [55 Cal.Rptr.3d 74] (Robert A.); Nicole K. v. Superior Court (2007) 146 Cal.App.4th 779, 784 [53 Cal.Rptr.3d 251]; In re Samuel P. (2002) 99 Cal.App.4th 1259, 1267-1268 [121 Cal.Rptr.2d 820]; In re Marinna J. (2001) 90 Cal.App.4th 731, 738-739 [109 Cal.Rptr.2d 267].) We therefore reach the compliance arguments.
(4) "The ICWA is designed to protect the interests of Indian children, and to promote the stability and security of Indian tribes and families. It sets forth the manner in which a tribe may obtain jurisdiction over proceedings involving the custody of an Indian child, and the manner in which a tribe may intervene in state court proceedings involving child custody. When the dependency court has reason to believe a child is an Indian child within the meaning of [ICWA], notice on a prescribed form must be given to the proper tribe or to the Bureau of Indian Affairs, and the notice must be sent by registered mail, return receipt requested." (In re Elizabeth W. (2004) 120 Cal.App.4th 900, 906 [16 Cal.Rptr.3d 514].)
The January 2007 disposition report, written when the twins' and half siblings' cases were being considered together for disposition, read: "The [ICWA] does or may apply. [L.'s father] reported that he doesn't have any Native American ancestry. In an investigation narrative completed by Martinez CPS Worker, Esmeralda Okendo, dated 4/27/05, [s]he interviewed [mother] regarding the family's Native American Ancestry. `Mother states that her maternal grandmother was Cherokee and her paternal grandmother was part Apache. She is not registered with any tribe and does not believe her mother established any affiliation. Maternal grandmother's name is Sharon Randle. Dexter's father is African American.'" A report addendum of February 2007 restated that the ICWA "may" apply, for possible Apache and/or Cherokee tribal eligibility. It added that Dexter and L.'s father had informed the court "that he might have Native American ancestry" and that HSA had "submitted Form JV-135 [Notice of Involuntary Child Custody Proceedings for an Indian Child] to the court office regarding [L.] and Benjamin."
Each child's case bore a separate number below: JD06-3425 for Dexter; JD06-3426 for L.; JD06-3426A for Benjamin; and JD06-3427 and JD06-3427A for the twins, and because the orders we review here affected only the twins, our appeal record includes only the proceedings directly involving their cases. This creates a problem in that, except for bare statements in a July 2007 status review report, and the August 2008 report and November 2008 addendum for the section 366.26 hearing, our record contains no further mention of ICWA. Those statements are that the ICWA "does not apply," but are unexplained, resulted in no express finding by the court, and are unsupported by any form JV-135 tribal notices for the twins.
*298 HSA implicitly concedes the deficiency but argues that, because the ICWA applies only to "Indian" children, defined by Congress as those (1) who are members or (2) who are eligible for membership and a child of a member (25 U.S.C. § 1903(4); In re O.K. (2003) 106 Cal.App.4th 152, 155-156 [130 Cal.Rptr.2d 276]), the scant and general information available to the court here did not require tribal notice. In re O.K. found information that a father "`may have Indian in him' . . . too vague and speculative to give the juvenile court any reason to believe the minors might be Indian children." (Id. at p. 157.) Here, we additionally had mother's belief that one of her grandmothers "was Cherokee" and another "part Apache" (tribes unidentified), yet mother also reported that she herself was not registered and did "not believe her mother established any affiliation." Whatever the status of the grandmothers, they were great-grandmothers to the twins, and this information did not suggest that the twins were members or eligible for membership as children of a member. We agree with HSA that this did not trigger a duty to notify tribes. Thus there was no error. Alternatively, we hold that any error was harmless.
An initial point of disagreement is whether we may take judicial notice of tribal notices from the half siblings' cases for the purpose of assessing whether there was "substantial compliance" here, defined by case law as "actual compliance in respect to the substance essential to every reasonable objective of the statute." (Stasher v. Harger-Haldeman (1962) 58 Cal.2d 23, 29 [22 Cal.Rptr. 657, 372 P.2d 649].) Mother observes that we generally assess error by what was before the court when it ruled (In re Zeth S. (2003) 31 Cal.4th 396, 400 [2 Cal.Rptr.3d 683, 73 P.3d 541] (Zeth S.)), that the ICWA notice materials in the half siblings' cases were not before the court in the twins' cases, that judicial notice is usually inappropriate for resolving facts, and that there was, in any event, no express court finding here of ICWA inapplicability to which we might look to the half siblings' cases for evidentiary support.
We express no opinion on those questions, for even if mother prevailed on each of them, it would not keep us from assuming noncompliance for argument's sake and taking judicial notice to find lack of prejudice. We do so, and explain below.
B. Judicial Notice. When determining whether a trial court committed error, we are generally limited to matters that were before the court when it ruled (Zeth S., supra, 31 Cal.4th at p. 400), and there is some authority for not taking judicial notice of ICWA efforts for that purpose, including a case from our own division (In re I.G. (2005) 133 Cal.App.4th 1246, 1252-1253 [35 Cal.Rptr.3d 427] [judicial notice declined for the purpose of providing evidence to support an implied ICWA finding]). Here, however, we take *299 judicial notice not to assess whether error occurred, but to assess whether there was resulting prejudice to any affected tribe. (In re Elizabeth W., supra, 120 Cal.App.4th at p. 908 [agency could have "attempted to mitigate the damage" it caused "by sending a new notice" pending appeal]; In re Christopher I. (2003) 106 Cal.App.4th 533, 566-567 [131 Cal.Rptr.2d 122] [augmentation allowed]; cf. Alicia B. v. Superior Court (2004) 116 Cal.App.4th 856, 866-867 [11 Cal.Rptr.3d 1] [same].)[4] As for mother's protest that doing so introduces evidentiary material unsuited for resolution through judicial notice, we observe that the only materials at issue here are documents. Documents speak for themselves, and where there is no extrinsic evidence, the interpretation of a written instrument is a pure question of law. (State Farm Mut. Auto. Ins. Co. v. Partridge (1973) 10 Cal.3d 94, 100 [109 Cal.Rptr. 811, 514 P.2d 123]; Estate of Dodge (1971) 6 Cal.3d 311, 318 [98 Cal.Rptr. 801, 491 P.2d 385]; Parsons v. Bristol Development Co. (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].) Mother raises no challenge to the accuracy or authenticity of these documents, which are all certified. Finally, of course, the question of prejudice itself is one of law for this court (Cal. Const., art. VI, § 13), not one for the trier below.
In resisting judicial notice, mother relies on Robert A., supra, 147 Cal.App.4th 982, which found a lack of ICWA notice despite indications of the father's Cherokee heritage, and declined the agency's request to find the error harmless based on ICWA notices and documents "filed in the separate dependency case of Robert's half sibling," who shared the same biological father. (Robert A., at pp. 988-989 & fn. 8.) Reasons given were (numbering ours): (1) the sibling's case was heard by a different judge; (2) the ICWA notices were issued after the error in Robert's case; (3) they were not filed in Robert's case; (4) documents did not include a court finding of compliance in the sibling's case; (5) an appeal determines "the correctness of a record that was before the trial court" when it ruled (citing Zeth S., supra, 31 Cal.4th at p. 405); and (6) the agency had a duty to give notices and file them, and any responses, in Robert's case. (Robert A., at pp. 989-990 & fn. 9.)
With due respect, reasons (3) and (6) simply state the error itself, not reasons to deny judicial notice to assess prejudice. Reason (5), that an appeal court reviews "the correctness of a record that was before the trial court" distorts Zeth S., which says that determining "`the correctness of a judgment'"i.e., whether error occurredis generally based on matters that were before the trial court (Zeth S., supra, 31 Cal.4th at p. 405); the case *300 does not address the use of judicial notice to assess prejudice. Reasons (1) and (2), that the ICWA efforts in the sibling's case postdated the error in Robert's case and were made before a different judge, surely influenced the court's refusal to imply a finding of ICWA compliance in Robert's case (Robert A., supra, 147 Cal.App.4th at p. 989), but we do not see why they militate against taking judicial notice to assess prejudice from ICWA error.
(5) That leaves Robert A.'s reason (6), that there was no proffered document showing that the court in the sibling's case made a finding of ICWA compliance. Mother seizes on that reason here, arguing that a clerk's notation on a docket sheet (see fn. 7, post) cannot be equated with a court finding of ICWA compliance in the half siblings' cases. We do not see why an absence of a compliance finding in a half sibling's case should matter. The question for an appellate court taking judicial notice is not whether there was a finding or sufficient evidence in the half sibling's case, but whether documents from that case show lack of prejudice in the case before iti.e., whether there is a reasonable probability of a different result absent the error (People v. Watson (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; Cal. Const., art. VI, § 13; Code Civ. Proc., § 475) or, as sometimes phrased in the ICWA context, whether there is "`no basis to believe'" a different result would occur as to the child's Indian status (In re Cheyanne F. (2008) 164 Cal.App.4th 571, 577 [79 Cal.Rptr.3d 189], quoting Nicole K. v. Superior Court, supra, 146 Cal.App.4th at p. 784). That task is not impeded by lack of a compliance finding in a half sibling's case.[5]
Robert A. and other cases favoring remand over judicial notice were recently distinguished in a case where judicial notice was sought of ICWA notice in a sibling's case that was "part of the same dependency case, in the same courthouse, before the same judicial officer." (In re E.W. (2009) 170 Cal.App.4th 396, 401 [88 Cal.Rptr.3d 338].) But the court added: "To the extent that any of these cases cannot be factually distinguished from the present case, we respectfully disagree based on considerations of judicial economy, the assured futility of providing identical notice regarding P., and the children's need for stability. Even a conditional reversal with limited remand would be an empty formality and a waste of ever-more-scarce judicial resources. This is because there is no doubt that the three Choctaw tribes and the BIA would respond to any ICWA notices regarding P. with the exact same answer as they did when they received these notices regarding E. In addition, the children have been placed together in their current foster/adoptive home since September of 2007, when E. was two years old and P. was seven months old. They deserve permanence and stability as soon *301 as possible. We cannot condone delaying that permanence for an empty exercise with a preordained outcome, especially where that exercise does nothing concrete to further the purposes of ICWA`to give tribes the opportunity to investigate and determine whether a child is an Indian child, and to advise the tribe of the pending proceeding and its right to intervene.' [Citation.]" (Id. at pp. 401-402.)
We agree and further noted the strong policy in dependency cases that they "be resolved expeditiously." (In re Jesusa V. (2004) 32 Cal.4th 588, 625 [10 Cal.Rptr.3d 205, 85 P.3d 2].)[6] We take judicial notice. And while we do find it necessary to distinguish Robert A., we do observe that the half siblings' cases began with the same dependency action as the twins', in the same court, and proceeded concurrently. In fact, the transcript of the first day of the section 366.26 hearing for the twins shows that a progress hearing regarding Benjamin was on calendar for that same morning and was continued by the judge here, pending further efforts to ascertain his whereabouts. This strongly implies that this judge was involved in the half siblings' cases.
C. Prejudice. The judicially noticed documents show that, in the cases of half siblings L. and Benjamin (Nos. JD02-3426 & JD02-3426A), the father vaguely claimed, as mother had, Cherokee or Apache ancestry. HSA sent tribal notices (standard form JV-135), return receipt requested, to 11 Apache and Cherokee bands, tribes or nations, and included information as to the father and mother plus copies of the petition. All addressees received the notices, and, by our count, only two (the White Mountain Apache Tribal Council and Apache Tribe of Oklahoma) did not respond. All others responded, between March and May of 2007, that the children were not members or eligible for membership. No document shows a court finding of ICWA nonapplicability, but a clerk's docket sheet entry of June 5, 2007, states in part, "no ICWA."[7]
*302 The object of tribal notice is to enable a review of tribal records to ascertain a child's status under the ICWA. (In re D. T. (2003) 113 Cal.App.4th 1449, 1455 [5 Cal.Rptr.3d 893]; In re Desiree F. (2000) 83 Cal.App.4th 460, 470 [99 Cal.Rptr.2d 688].) Notice requirements are strictly construed and notices "must contain enough information to be meaningful. [Citation.]" (In re Francisco W. (2006) 139 Cal.App.4th 695, 703 [43 Cal.Rptr.3d 171]; see In re C.D., supra, 110 Cal.App.4th at pp. 224-225.) Our role is to assess prejudice from any error. (Nicole K. v. Superior Court, supra, 146 Cal.App.4th at p. 784.)
(6) We need not further detail the contents of the notices. Tribal determinations of a child's membership and eligibility are conclusive. (Robert A., supra, 147 Cal.App.4th at p. 988.) Having closely read mother's briefing on the materials for judicial notice, we find no argument at all that the notices were in any way deficient or misdirected, or that any response was uninformed. That being so, we accept the determinations, which show no Cherokee or Apache membership or eligibility for the half siblings, based in part on mother's information. It follows that there is no reason to believe that the result would be any different if the notices were reissued on remand for an assessment based on mother's information alone. There is no argument, or suggestion whatsoever, that the twins' father had or claimed any Indian ancestry.
Although it does not affect our decision, we are troubled by something not brought to our attention by either party. That is, the certificate of mailing appended to the form JV-135 mailed to the tribes in the half siblings' cases shows a mailing to Nina Bhutani, mother's counsel here. Bhutani surely would have seen all of the tribal addressees and known of the ICWA efforts. We have stressed in this opinion a policy of preserving scarce judicial resources, and this applies, of course, to appellate resources. It appears that a brief communication between mother's appellate counsel and her trial counsel could have clarified or eliminated this issue.
Any error in ICWA notice was harmless, and this leaves no need to consider further arguments.

*303 DISPOSITION
The order is affirmed.
Haerle, Acting P. J., and Richman, J., concurred.
NOTES
[1] All unstated section references are to the Welfare and Institutions Code.
[2] Bhutani had remarked earlier that, while she felt she had "a right to defend" herself in mother's Marsden motion, she felt it was not "appropriate" to do so until the court had first heard and resolved her own "McKenzie motion" to withdraw. This proved to be an illusory distinction, for the court resolved both motions at once, on the same showing.
[3] Mother offers, as deficient presentation of her section 388 petition, Bhutani's (1) failure to raise a hearsay objection to the social worker revealing that the children's therapist felt mother had made false promises to the twins during visits, and (2) late disclosure of an expert witness, director of a prerelease program, which resulted in the witness's exclusion and loss of ability to testify about mother's participation in an internship program. These arguments fail as lacking legal analysis or a record divulging why counsel acted or failed to act as she did (cf. People v. Mendoza Tello (1997) 15 Cal.4th 264, 266-267 [62 Cal.Rptr.2d 437, 933 P.2d 1134]; People v. Wright (1990) 52 Cal.3d 367, 404-405 [276 Cal.Rptr. 731, 802 P.2d 221]). Nor were these asserted deficiencies raised on the Marsden motion.
[4] We could also consider nonrecord materials to assess whether ICWA compliance has rendered the appeal issue "moot" (In re C.D. (2003) 110 Cal.App.4th 214, 224 [1 Cal.Rptr.3d 578] [augmenting with postorder efforts]), the underlying problem there similarly being a legal question of whether there remains an actual controversy for which we may grant effectual relief (Paul v. Milk Depots, Inc. (1964) 62 Cal.2d 129, 132 [41 Cal.Rptr. 468, 396 P.2d 924]).
[5] Indeed, if there were a compliance finding in a half sibling's case, it might rest not just on the documents offered for judicial notice, but partly on testimony and communications not shown by the documents themselves.
[6] Some decisions denying judicial notice reveal an implicit policy, borne of evident frustration at the persistence of ICWA notice error, of using remand as a way of coercing agency compliance. (E.g., In re I.G., supra, 133 Cal.App.4th at p. 1253, and cases discussed.) We do not have that concern here, where the agency did give tribal notices, albeit only in half siblings' cases while overlooking the need to do so and file documents separately in the twins' cases. We also question the utility of continuing to use remand as a coercive tool where judicial notice can alleviate the need for remand and serve the policy of resolving dependency cases expeditiously. (Cf. In re James F., supra, 42 Cal.4th at p. 918.)
[7] There may in fact be such a finding. HSA represents in its judicial notice request: "On June 5, 2007, the court found that the ICWA did not apply to [L.] and Benjamin, but the minute order from that hearing does not have any written findings regarding the ICWA. The court reporter from that hearing is currently on vacation out of the country. Therefore, the Agency submits the court clerk's written notes indicating that the court found that the ICWA did not apply." Whether the oral or the written records would control in the event of a conflict (see generally People v. Smith (1983) 33 Cal.3d 596, 599 [189 Cal.Rptr. 862, 659 P.2d 1152]) is unnecessary to decide, for neither party has provided us with further information to show a conflict.