Filed 5/24/23  In re A.K. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.K., a Person Coming Under the Juvenile Court Law. | B319793 (Los Angeles County Super. Ct. No. 18CCJP03827C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JEANNE K.,<br><br>Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Robin Kesler, Juvenile Court Referee.  Affirmed.

Jill Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jane Kwon, Principal Deputy County Counsel, for Plaintiff and Respondent.

* * * * * *

Jeanne K. (mother) appeals from the juvenile court's order terminating her parental rights to A.K. (born 2015). Mother contends the order must be reversed because the beneficial parent-child exception applies.

Mother also challenges the finding that the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) was not applicable because no inquiry was made to maternal grandmother before the permanency planning hearing. We take judicial notice of the fact the Los Angeles County Department of Children and Family Services (DCFS) has made an inquiry of maternal grandmother who denied Indian ancestry. We conclude that any error in making this inquiry after the permanency planning hearing was harmless.

Thus, the order terminating mother's parental rights is affirmed, and mother's ICWA challenge is moot.

## BACKGROUND

### Petition and Detention

Mother and her children were investigated by DCFS in 2014, 2016, and 2017 based on allegations that the children had been neglected due to mother's substance abuse and resulting caretaker absence. DCFS recommended to mother that she enroll in a drug treatment program, but she failed to complete any program.

2

In 2018, DCFS received a report mother had planned to harm herself by overdosing on a cocaine injection. During the investigation, mother admitted she used methamphetamines and alcohol when stressed, but declined to answer whether she used them in front of the children.

In June 2018, DCFS filed a petition under Welfare and Institutions Code section 300, subdivision (b),[1] on behalf of A.K. and mother's two older children, Andrew and Ariel.[2] DCFS alleged that mother was unable to provide adequate supervision and was placing the children at substantial risk of serious physical harm due to her substance abuse, as well as her mental and emotional problems. At the detention hearing, the children were removed from mother's care, and A.K. was placed with Ms. C. Monitored visits were ordered for mother.

The detention report contains facts supporting the necessity of detention, including mother's history of drug use, her admission to using methamphetamine with alcohol to manage her stress, and her admission of a plan to harm herself by overdosing on cocaine. The report also noted mother had no contact with A.K.'s father, Timothy Earl Ferris,[3] due to a stay-away order based on domestic violence.

Two months later, on August 7, 2018, DCFS filed a first amended petition, alleging that Andrew and Ariel's father, Randall Vessells, had endangered the children's safety by misusing methamphetamines, alcohol, and marijuana. It also

---

[1]    All further unattributed statutory references are to the Welfare and Institutions Code.

[2]    Andrew and Ariel are not subjects of this appeal.

[3]    Ferris is not part of this appeal.

3

alleged the children were endangered by his mental and emotional problems.

During this time, mother enrolled in an outpatient program and participated in counseling to develop a relapse prevention plan and received mental health services. DCFS acknowledged mother's progress but noted she had not completed her substance abuse program and that her live-in boyfriend had not submitted to being live scanned, as requested.

**Adjudication hearings**

Mother filed a signed waiver of rights and, thus, the juvenile court sustained the first amended petition on December 7, 2018. However, the court did not make a determination whether to return custody of the children to mother; instead, the juvenile court continued the hearing to January 25, 2019, to obtain a supplemental report on mother's progress.

At the January 2019 hearing, the juvenile court declared the children dependents of the court and removed them from parental custody. Reunification services and monitored visits were ordered for the parents.

**Reunification Period**

Reunification services were provided from January 2019 to April 2022. Mother stopped attending her drug treatment program due to a relapse, but reenrolled in February 2019. The children visited their mother two to three times a month at a mall or park. Mother was observed to have difficulty monitoring the three children and setting behavioral boundaries.

At the July 24, 2019 six-month review, the juvenile court ordered unmonitored visitation for mother every other week,

conditioned on her continuing to test negative for drug-related substances and identifying the visit location for DCFS.

During this time the children made significant improvements in their foster homes. For instance, Andrew and A.K. became less aggressive and more emotionally expressive, and A.K.'s speech improved due to speech therapy. Andrew focused more on his schoolwork and acted less hostile in class. A.K. was sleeping through the night. Their sister, Ariel, demonstrated her creativity and enjoyed skateboarding.

During this same time mother's housing was unstable, as she was moving between Whittier and San Bernardino. She had two relapses and did not complete her court-ordered program. She was not forthcoming about her relapses because she did not want her visits to become monitored. When she submitted to drug testing, it was often negative, but she would then not appear for testing for weeks or months thereafter. Mother did not complete the required parenting program and admitted to not taking her psychotropic medication. Because of her noncompliance and relapses, DCFS changed the visits to monitored.

Monitored visits occurred in the park or mall, and mother's parenting style was inappropriate. When A.K. wanted attention, mother often ignored him. She would allow him to roll around on the floor of the mall and did not monitor his safety or behavior. Additionally, mother canceled the visits on several occasions.

DCFS assessed the risk as high for abuse and neglect if the minors were returned to mother, who was not in compliance with her court-ordered programs and had not shown long-term stability with her sobriety, mental health, or housing. When asked, Ariel and Andrew stated they wished to stay in their foster homes. A.K. was too young to make a statement.

Based on mother's lack of progress and the risk to the children, the juvenile court terminated reunification services at the 12-month review in September 2020. Mother filed two petitions for modification requesting additional reunification services. Both were denied because the court found no substantial change in mother's circumstances and that the requests were not in A.K.'s best interest.

**Proceedings for ICWA**

DCFS attached the Indian child inquiry attachment, form ICWA-10, to its petition and based on its inquiry A.K. had no known Indian ancestry. In addition, mother filed the parental notification of Indian status, form ICWA-020, on June 18, 2018, and stated she had no Indian ancestry.

Consequently, at the June 18, 2018 detention hearing, the juvenile court found no reason to know A.K. had Indian ancestry. Mother, however, then claimed some heritage on father's side of the family, and DCFS was ordered to present evidence of its efforts to locate the father. Despite their efforts, the father was not found.

Mother subsequently stated her belief she had Cherokee heritage, but later denied it and asked DCFS to "forget about it." DCFS sent notices to the Bureau of Indian Affairs, Cherokee Nation, Department of the Interior, Eastern Band of Cherokee Indians, and United Keetoowah Band of Cherokee. These notices included information about the parents and maternal grandparents, but only the Eastern Band of Cherokee Indians responded, stating that A.K. was not registered or eligible to register as a member. No other entity responded to the notices.

**Permanency Planning Hearing**

At the April 11, 2022 hearing, mother argued that the beneficial relationship exception applied. The juvenile court found mother had failed to establish the exception applied and terminated mother's parental rights. The court also found it had no reason to believe ICWA applied but requested that DCFS further investigate any relatives it could find.

Mother filed a timely notice of appeal on April 12, 2022.

**Postappeal ICWA inquiry and order**[4]

The juvenile court held a hearing on September 16, 2022, to review DCFS's efforts to contact mother's relatives. The court considered the DCFS report, which stated that maternal grandmother had been contacted and had replied she had no Indian ancestry. Further, maternal grandmother added that maternal grandfather had no Indian ancestry. As a result, the juvenile court found no reason to know A.K. is an Indian child, as defined by ICWA, and did not order any notice to be given to any tribe or the Bureau of Indian Affairs.

---

[4]     We grant DCFS's request for judicial notice of these postappeal proceedings. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

In determining whether the juvenile court committed error, an appellate court generally is limited to matters that were before the juvenile court when it made the ruling at issue. (*In re Zeth S.* (2003) 31 Cal.4th 396, 400.) Here, we do not take judicial notice of the postappeal proceedings to determine whether error occurred under ICWA; indeed, we assume below that DCFS breached its duty of inquiry under ICWA. Rather, we take judicial notice to determine whether there was resulting prejudice from that assumed error. (*In re Z.N.* (2009) 181 Cal.App.4th 282, 298-299.)

## DISCUSSION

### I. Applicable law and standard of review

Once a juvenile court has terminated reunification services and determined a child is adoptable, the court is required to terminate parental rights unless it finds an applicable exception. (§ 366.26, subd. (c)(1).) The exception at issue here, sometimes referred to as the beneficial parent-child exception, applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

The parent bears the burden of proving that the exception applies. (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 952-954.) To do so, the parent must prove three statutory elements: "(1) regular *visitation and contact*, (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*).)

For the first element, visitation, the question is simply whether the parent consistently visited, as permitted by court orders. The focus is not on punishing or rewarding parents for their behavior in visiting or maintaining contact, but on the best interests of the child. (*Caden C., supra*, 11 Cal.5th at p. 632.)

As to the second element, whether the child would benefit from continuing the relationship, "the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C., supra*, 11

8

Cal.5th at p. 636.) The parent must also show that "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).) Relevant factors in assessing the parent-child relationship include "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." (*Id.* at p. 576.)

For the third element, whether termination would be detrimental to the child, the court must determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C., supra*, 11 Cal.5th at p. 633.)

We review the juvenile court's findings concerning visitation and whether the child would benefit from continuing the relationship with the parent for substantial evidence. (*Caden C., supra*, 11 Cal.5th at pp. 639-640.) Whether termination of parental rights would be detrimental to a child because of the child's relationship with the parent is a question we review for abuse of discretion. (*Ibid.*)

In this case, the juvenile court found mother had met her burden on the first element by showing regular visitation and contact with A.K. It found she failed to meet her burden to show the second element by establishing a beneficial relationship existed between herself and A.K. It also found she did not meet her burden on the third element because she did not establish that losing the relationship with mother would be detrimental to A.K.

9

## II. Substantial evidence supports the finding of no beneficial relationship

Mother argues the juvenile court erred by finding no beneficial relationship between her and A.K. because it relied on her lack of sobriety and absence of a parental role in A.K.'s life. Her arguments, however, focus on select statements made by the juvenile court at the hearing, rather than the entire record before the juvenile court.

In its order, the juvenile court relied on DCFS reports filed in 2020, 2021, and 2022. This evidence shows A.K. had spent three of his six years in the custody of his mother and the rest with Ms. C. And, prior to A.K.'s 2018 detention, the evidence showed his caregivers were his siblings or his mother's boyfriend. Mother identified no evidence showing that A.K. had developed a substantial bond with her in the portion of his life before detention.

Additionally, a beneficial relationship is based on finding positive effects for the child or conduct that meets the child's particular needs. (*Autumn H., supra*, 27 Cal.App.4th at p. 576.) In her visits with A.K. after the detention, mother brought gifts and money and would allow him to do whatever made him happy. If A.K. had a bad day or misbehaved, mother would laugh and find the misbehavior funny. This is not enough to establish a beneficial relationship and, as a result, mother did not identify any specific evidence showing that her relationship with A.K. had positive effects or met his particular needs.

Although A.K. enjoyed seeing mother at the visits, that alone is not sufficient to establish the beneficial parent-child relationship. (*In re C.F.* (2011) 193 Cal.App.4th 549, 555 [loving contact or pleasant visits are not sufficient to show a significant,

10

positive, emotional attachment between child and parent].) Mother failed to identify any additional evidence showing a substantial, beneficial relationship with A.K.

Further, mother does not identify evidence that A.K. displayed any behavior or emotions from which an inference could be drawn that he had a substantial attachment to mother. Such evidence, for example, would be facts showing A.K. cried or was disappointed when the visits with mother ended.

Thus, substantial evidence in the record supports the finding that mother did not have a substantial, beneficial relationship with A.K., and the parental benefit exception did not apply.

## III. No abuse of discretion in finding no detriment to A.K. would result from termination of the parental relationship

Even if mother had established she had a substantial relationship with A.K., this would not be grounds to reverse the order because she did not establish that termination of her parental rights would create a detriment to A.K. that outweighed the benefit of his adoptive home. The benefits of adoption include the security and sense of belonging that a new family would confer. (*Autumn H., supra*, 27 Cal.App.4th at p. 575.)

A.K. had been residing with Ms. C. from his 2018 detention to the permanency planning hearing in 2022. A.K. was bonded to Ms. C. and thriving in a loving and trusting relationship and a nurturing and structured home environment. He called his caregivers "mom," sought out their attention, and wanted to be wherever they were.

The record, therefore, showed the adoptive home would provide substantial benefits to A.K. Mother identified no evidence

11

showing that terminating her parental rights would create a detriment that outweighed these benefits. Therefore, there was no abuse of discretion in finding no detriment to A.K. would result from termination of the parental relationship, and the benefits of the adoptive home outweighed the detriment of terminating parental rights.

## IV. No prejudice from defect in initial ICWA inquiry

Mother argues that the juvenile court erred by finding ICWA did not apply because no inquiry was made to maternal grandmother. However, after the April 11, 2022, hearing, DCFS contacted maternal grandmother, who stated that neither she nor the maternal grandfather had Indian ancestry. Mother's contention, therefore, is moot.

Despite this, mother argues that further inquiries should be made because DCFS admitted it had received a list of 22 possible relatives of A.K. However, the record shows that DCFS made an inquiry to these individuals when it sent a letter to each person inquiring about their possible relation to A.K. or mother. Eight letters were returned and only one individual contacted DCFS to explain he was not related to A.K., according to DCFS. No response to the other 13 letters was received. Therefore, further inquiry was made.

DCFS satisfied its affirmative and continuing duty to inquire whether A.K. may be an Indian child. (§ 224.2, subd. (a).) This duty of inquiry includes, but is not limited to, "asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b).) Under ICWA, the

12

term "extended family member" is "defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2).)

Aside from the argument about maternal grandmother, mother does not identify how the juvenile court erred by finding that DCFS had satisfied its duty of inquiry. The juvenile court relied on reports filed by DCFS that identify its efforts to contact relatives and any identified person about A.K.'s possible Indian ancestry. Therefore, there are no grounds to find the juvenile court erred by concluding there was no reason to believe A.K. was an Indian child.

Further, even if DCFS had failed to conduct a proper inquiry, this failure is harmless unless the record contains information suggesting a reason to believe that the child may be an 'Indian child' within the meaning of ICWA, such that the absence of further inquiry was prejudicial to the juvenile court's ICWA finding. (*In re Dezi C.* (2022) 79 Cal.App.5th 769, 777, review granted Sept. 8, 2022, S275578.) For this purpose, "the 'record' includes both the record of proceedings in the juvenile court and any proffer the appealing parent makes on appeal." (*Id.* at p. 779.)

Nothing in the record suggests a reason to believe that A.K. is an Indian child within the meaning of ICWA. Mother makes no proffer on appeal that she has any Indian heritage or that she has any information regarding possible Indian heritage on father's side. There is no special circumstance suggesting that mother or maternal grandmother would not know their own

heritage. In sum, there is no evidence that any extended relative had any information pertaining to whether A.K. had Indian heritage.

## DISPOSITION

The juvenile court's order terminating mother's parental rights to A.K. is affirmed.

_____
CHAVEZ, J.

We concur:

_____
LUI, P. J.

_____
HOFFSTADT, J.