Filed 4/21/14  In re M.A. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re M.A. et al., Persons Coming Under the Juvenile Court Law. | B248359 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CEDRIC A.,<br><br>    Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK94363) |

APPEAL from orders of the Superior Court of Los Angeles County, Terry T. Truong, Juvenile Court Referee.  Affirmed.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Tracey F. Dodds, Principal Deputy County Counsel, for Plaintiff and Appellant.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

INTRODUCTION

The juvenile court declared the eight children of Cedric A. (father) were defined variously by Welfare and Institutions Code[1] section 300, subdivisions (b) (failure to protect), (d) (sexual abuse), and (j) (abuse of a sibling), removed the children from father's custody, limited father's ability to make educational decisions for one child, and declared it had no reason to know that the children were Indian children as defined by the Indian Child Welfare Act (25 U.S.C. § 1901 et seq. (the ICWA)). Father appeals and the Department of Children and Family Services (the Department) cross-appeals. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

1. *The detention report*

Viewing the evidence in a light most favorable to the juvenile court's findings as we are required to do (*In re Alexis E*. (2009) 171 Cal.App.4th 438, 450-451), it shows the following. Father has eight children: M., age 17; Virginia, age 16; K., age 14; Addison, age 12; S., age 10; Hannah, age 7; Catherine, age 5; Sariah, age 3. The children's mother died in 2010 after the youngest child was born. In June 2012, the family moved from Texas to live with the paternal aunt R. and uncle Kevin A.

Three months later, the Department received a telephone call alleging father had been sexually and physically abusing the children. The caller stated that father has been sexually abusing his four youngest daughters since their mother died. Father has kept the children out of school for several years because he wanted to isolate them. Father hit the children when they lived in Texas but has not hit them since they moved in with their paternal relatives in California. However, father declared his intention to move the family into their own place and so the children were fearful that father would resume hitting them.

The Department investigated and gathered the following statements: According to R., the children began relating more information to her each day. They told her that

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise noted.

2

father hit them for punishment when they lived in Texas. Virginia told R. that several years earlier in Texas, father spanked Virginia with a belt causing her to bleed on the back of her thighs. Catherine reported to Virginia that a few days before the interview, father "touched [Catherine's] 'pee-wee' and she asked him to stop." Catherine was crying at the time father did this.

M. told the investigating social worker that things have not been good since their mother died. The children did not have enough food and bills went unpaid. The children do not attend school consistently. Father does not let the children socialize with others and so some of his siblings have social problems. Father wanted the oldest two, M. and Virginia, to stay out of school and care for the youngest children. Sometimes father hit the children with a belt as discipline and complained the following day that his arm was sore from doling out the punishment. Most of father's anger was focused on the older three children and they would be hit even if they did nothing wrong. M. was afraid of father. Father has been hitting M. with a belt since the child was three months old, mother once told him. The last time father hit M., the child bled on the back of his leg and arms. Father hit Catherine, now only five years old, on the side of her head giving her a lump. M. explained that the children lied to the Texas child protective services during that agency's two investigations because father had told them they would have nowhere to go if they said anything. Father has not hit any of them since they left Texas for fear someone will tell the authorities.

M. also reported that father touched his little siblings in their private areas. When they lived in Texas, M. walked in on Catherine and father in father's bed about seven times. The last time he walked in, about two years earlier, father was touching Catherine on her vagina and the child was crying and telling father "to 'stop please stop.' " Because M. had just changed the child's diaper, father could not have been touching the child to clean her. M. believes this occurred more recently in California because Catherine told an older sister that father touched her private parts. M. stated that his little sisters all watch pornography with father while sitting on father's lap. The sisters imitate what they see. Hannah told him that father touched her when she was three or four years

3

old.  M. does not like and does not want to live with father.  He is afraid that if he does not speak up now, the situation will worsen when the family moves out and father is alone with the children.  Things have been very good since the family moved in with R. and Kevin.  M. repeated this information two days later when a deputy sheriff was present.

Then-three-year old Catherine spoke very quietly to the social worker while her paternal uncle was present.  Without prompting, Catherine stated, " 'daddy touched my pee wee' " and her buttocks.  The child reported she was wearing a dress at the time.  Father did this only once.  Catherine told her sister Virginia about it.  Catherine also stated that father hits Virginia.  Later, in the presence of a deputy sheriff, Catherine initially denied that anyone ever touched her front or buttocks, but then stated that " 'daddy touched my pee wee' " " 'with his hand.' "

Virginia told the social worker that she was punished for her siblings' behavior.  Before the family moved to California, father hit her with a belt so hard that her upper thigh was cut open.  Although father generally ceased hitting the children after moving to California, he hit Sariah with a belt about two weeks before the interview.  Virginia also confirmed Catherine's report about father touching Catherine.  Virginia added that she knew the allegations of sex abuse were true because Catherine was always on father's lap and he was always "messing" with her skirt.  Virginia once saw father with his hand up Catherine's skirt.  Virginia confirmed that father watches pornography with the four youngest daughters.  The Texas authorities have questioned her in the past about allegations that father hit her but Virginia lied to protect him.  Asked how she would solve the family problems now, Virginia stated: " 'I do not want my father here.' "  In the presence of the deputy sheriff, Virginia reported that when the family lived in Texas, she saw father in a bedroom with her little sisters whose skirts were "up."

Father admitted spanking the children with a belt on their buttocks, and claimed the conduct was legal.  He merely threatened the younger children.  He explained that the older children "write standards" as discipline.  He denied being in bed under the covers with any of his daughters.  Father spoke of his religious beliefs and the need for the

4

children to dress modestly. He complained that R. is too lax with his children. Father did not want the social worker to interview the children without the paternal uncle present.

The Department detained the children and placed them with R. and Kevin. With a removal order, the Department ordered father to move out of R.'s and Kevin's house. The Department then filed a petition alleging the children required juvenile court protection pursuant to section 300, subdivisions (a) (physical harm), (b) (failure to protect), (d) (sexual abuse), and (j) (abuse of a sibling).

2. *The jurisdiction report*

The children reiterated their earlier statements.

Uncle Kevin A. reported that father had confided in him and the paternal grandfather that father watches pornography and was physically abusive to the children.

Maternal aunt Lillian G. stated that K. was a very bright boy and an active, fun-loving child when he was younger. However, "following an accident caused by the father, he was never the same." Lillian elucidated that when K. was two or three years old, father became angry at mother for disrespecting him in public. Aunt Lillian watched father become physically aggressive, pushing and shoving everyone out of the house. Father shoved K. hard, ramming the child's head into the door or the door jamb. Since then, mother noticed a difference in K. but was afraid to seek help.

Addison told the social worker that after mother passed away, father became mean and would not buy bread. Addison did not think father would let his sons in the room when he was watching pornography with the girls, who he stated were father's favorites.

Asked about watching pornography, S. replied " 'we have family secrets so I have to practice what I say so I don't tell any secrets.' "

R. reported that father blamed and disciplined all of the older children for the misdeeds of the younger children. According to R., the children's fear of father became more pronounced after the court ordered him out of the house. Each child has expressed fear and all were crying before they went to visit father. Some were concerned father would kidnap them or try to kill them. R. found it difficult to console the children who

were only convinced of their safety after their uncle was made a monitor and their aunt promised to wait for them during visits.

In a forensic interview, Catherine reiterated her initial statements about sexual abuse. The three younger children all display "increased sexualized behaviors and talk."

The juvenile court ordered an assessment for the caretakers, a psychological and neurological assessment for K., and a speech assessment for Catherine. K.'s attorney expressed concern that his client was facing expulsion from school and had not had an Individual Education Plan (IEP) because father was uncooperative. The juvenile court gave father two options: Either cooperate and sign off on the IEP or the court would limit father's right to control the child's education.

Father did not cooperate in securing the needed services for K. He failed to sign the necessary paperwork for the IEP. The Department requested that R. be named holder of the children's educational rights.

3. *The adjudication hearing*

The juvenile court admitted into evidence the Department's reports, informations, and the forensic interviews. Catherine was the only witness to testify at the adjudication hearing. Asked whether anyone had ever touched her in a way that hurt her, she replied, "Daddy." Asked what happened when daddy touched you and hurt you, she replied "[h]e popped my booty" and pointed to her buttocks.

At the close of the hearing the juvenile court sustained the petition. Concerning the sexual abuse, the juvenile court found true that: " 'On prior occasions in 2012, the children [M.] [], Virginia [], [K.] [], Addison [], [S.] [], Hannah [], Catherine [], and Sariah's [] father, Cedric [], inappropriately sexually touched the child Catherine by fondling the child's vagina. Such inappropriate sexual touching of the child by the father endangers the child and places the child and the child's siblings [S.], Hannah, and Sariah at risk of harm.' " The court specifically stated that "this is a sexual abuse [case] as it is defined under Penal Code section 11165.1, subdivision (b)[](4). It is the intentional touching of the genitals for purposes of sexual arousal or gratification." The court found the older children were not at risk of sexual abuse.

6

With respect to the physical abuse, the juvenile court found, although father physically abused the children, that the abuse did not "rise to the level" of a violation of section 300, subdivision (a). However, finding these allegations to be sufficient to declare all of the children dependents under subdivision (b) of section 300, the court sustained the allegations, as amended, that the children were at risk because father (1) inappropriately touched Catherine by fondling the child's vagina; (2) physically abused M. by striking the child with belts, inflicting bleeding lacerations to the child's legs and arms; (3) repeatedly struck Virginia on the thigh with belts inflicting a bleeding laceration to the child's thigh; and (4) physically abused K., Addison, S., Hannah, and Catherine by striking their bodies with belts. Such abuse endangers the children's health, safety, and well-being, creates a detrimental home environment, and places the other siblings at risk of physical harm. The court declared Catherine, S., Hannah, and Sariah to be described by section 300, subdivisions (d) (sexual abuse) and (j) also.

As for the disposition, the juvenile court found there was clear and convincing evidence of a substantial danger to the children's physical health, safety, or emotional well-being if they were returned to father's custody, and ordered them removed from father's custody. The court granted K.'s attorney's request and limited father's educational rights over K. only. Additionally, the court ordered, among other things, that M., Virginia, K., Addison, S., and Hannah be in individual counseling, and Catherine be referred for speech and play therapy, and an IEP. M. and Virginia were to have wraparound services. Father and the Department filed their timely appeals. We will address additional facts concerning the ICWA below.

CONTENTIONS

In his appeal, father contends (1) there was insufficient evidence to sustain the petition; (2) there was no evidence of risk of harm to justify removal of the children from father's care; (3) the juvenile court violated father's liberty interests by limiting his right to direct his child's education; and (4) the ICWA finding was reversible error.

In its appeal, the Department contends the juvenile court erred in failing to find the children were described by section 300, subdivision (a).

7

DISCUSSION

1. *The adjudication order is supported by sufficient evidence.*

Father's challenge to the adjudication order is solely that there is no evidence to support the findings. Father recites only the evidence in his favor and omits or discredits the evidence supporting the jurisdictional finding. He also questions the credibility of some witnesses and asserts that some children have "vendetta[s]" against him. Father claims he is "adamant" that he did nothing wrong. None of these arguments is availing. Father overlooks our role in reviewing a finding for substantial evidence.

"In a challenge to the sufficiency of the evidence to support a jurisdictional finding, the issue is whether there is evidence, contradicted or uncontradicted, to support the finding. In making that determination, the reviewing court reviews the record in the light most favorable to the challenged order, resolving conflicts in the evidence in favor of that order, and giving the evidence reasonable inferences. Weighing evidence, assessing credibility, and resolving conflicts in evidence and in the inferences to be drawn from evidence are the domain of the trial court, not the reviewing court. Evidence from a single witness, even a party, can be sufficient to support the trial court's findings. [Citations.]" (*In re Alexis E.*, *supra*, 171 Cal.App.4th at pp. 450-451.)

a. *Substantial evidence supports the juvenile court's finding true the section 300, subdivisions (b) and (j) allegations that father struck the children.*

Subdivision (b) of section 300 authorizes dependency jurisdiction when "[t]he child has suffered, *or* there is a substantial risk that the child *will suffer*, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child . . . ." (Italics added.) "The statutory definition consists of three elements: (1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, *or* a 'substantial risk' of such harm or illness." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820, italics added.)

Subdivision (j) of section 300 authorizes dependency jurisdiction when "[t]he child's *sibling* has been abused or neglected, as defined in subdivision . . . (b) . . . and

8

there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions." (Italics added.)

The record here contains more than sufficient evidence to support the juvenile court's finding that *all of the eight children* were at risk of serious physical harm and defined by section 300, subdivisions (b) and (j). Father admitted he hit the children with a belt. R., Virginia, M., Aunt Lillian all stated that father's mode of physical punishment was to hit the children with a belt enough to cause lumps and bleeding. The severity of father's violence is evidenced by Aunt Lillian's report of K.'s injuries. Father even hits his infants and toddlers. Father has steadfastly remained unremorseful about the injuries he has inflicted on his children, feeling instead that he was justified by Texas and California law.

Father contends there is no evidence he physically abused his children in California; there is only evidence he spanked them in Texas. Furthermore, he observes, there is no evidence that he harmed the children or drew blood when he spanked them in Texas. That is, he argues, there was no evidence of a physical effect of any abuse and hence, no evidence to support the finding the children are at current risk of being abused. Father is wrong.

The juvenile court need not find evidence of risk of harm at the time of the jurisdictional hearing because the showing required under section 300, subdivision (b) "can be met based on evidence of prior acts." (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1438, but see *In re J.N.* (2010) 181 Cal.App.4th 1010, 1024.) Not only is there evidence that father hit at least one toddler, Sariah, with a belt just two weeks before the Department's first contact with the family, but both M. and Virginia stated -- the court believed -- that father did not merely spank his older children as he asserts, but he beat children of all ages with a belt and has express neither remorse nor recognition it is abusive. Although there were no marks on the children at the time the Department first learned of the abuse, jurisdiction is supported by the statements of these children that when father beat them in Texas, he caused bleeding, lacerations, and lumps, and put the children in grave fear of father, as they cry inconsolably at the prospect that R. and Kevin

9

might no longer protect them. The purpose of dependency proceedings is to prevent harm, not ignore the risk. (See § 300.2; *In re Eric B.* (1987) 189 Cal.App.3d 996, 1003.)[2] The record amply supports the juvenile court's finding that the children are described by section 300, subdivision (b) and hence by subdivision (j) as the result of father's conduct in Texas and in California.

b. *Substantial evidence supports the juvenile court's finding true that father inappropriately sexually touched Catherine (§ 300, subd. (d)).*

A child will come within the jurisdiction of the juvenile court under subdivision (d) of section 300 if "[t]he child has been sexually abused, or there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by his or her parent . . . ."

Penal Code section 11165.1 defines sexual abuse as "sexual assault." That section then explains that conduct described as "sexual assault" includes, inter alia, "The intentional touching of the genitals or intimate parts . . . or the clothing covering them, of a child, or of the perpetrator by a child, for purposes of sexual arousal or gratification, except that, it does not include acts which may reasonably be construed to be normal caretaker responsibilities; interactions with, or demonstrations of affection for, the child; or acts performed for a valid medical purpose." (Pen. Code, § 11165.1, subds. (a), (b)(4).)

Father argues that there is no evidence that his touching was "for purposes of sexual arousal or gratification." (Pen. Code, § 11165.1, subd. (b)(4).) Not so. M. reported having witnessed father touching Catherine on her vagina while the child cried and asked him to stop. There was no reason for father to be touching the child except for sexual gratification, as M. explained the child's diaper had just been changed.

---

[2]      Section 300.2 reads, "the purpose of the provisions of this chapter relating to dependent children is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, *and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm. . . .*" (Italics added.)

10

Furthermore, many of the children reported that father watches pornography with the littlest girls, while the children sit on his lap.

Furthermore, a qualifying act of sexual assault is molestation under Penal Code section 647.6. (Pen. Code, § 11165.1, subd. (a).) That section does not require sexual arousal or gratification as a predicate. Additionally, subdivision (b) of section 11165.1 of the Penal Code describes other acts that constitute "sexual assault," and do not require sexual arousal or gratification. Subdivision (b) reads, "[c]onduct described as 'sexual assault' includes, but is not limited to, all of the following: [¶] . . . [¶] (3) Any intrusion by one person into the genitals or anal opening of another person, including the use of any object for this purpose, except that, it does not include acts performed for a valid medical purpose." Thus, although the juvenile court specifically found father had sexually abused Catherine for purposes of sexual arousal or gratification under Penal Code section 11165.1, subdivision (b)(4), the absence of evidence of sexual gratification does not undermine the order declaring Catherine a dependent based on father's sexual abuse.

Father also contends Catherine's testimony did not support a finding he sexually abused her and so there was insufficient evidence that she or any of her sisters were at risk of sexual abuse. Notwithstanding his admission that Catherine reported to her family that father touched her on her anus and vagina, father nonetheless attempts to impeach the child's credibility. He states, "there were so many variations of the story that it would have been impossible for the court to find any one statement to be credible."

The juvenile court clearly believed Catherine's testimony as well as that of Virginia, M., and R., as it declared Catherine a dependent pursuant to section 300, subdivision (d). We may not reweigh that determination. (*In re Casey D*. (1999) 70 Cal.App.4th 38, 52.)[3] In sum, the evidence supports the order declaring Catherine, S.,

---

[3]  Father's reliance on *In re Alysha S*. (1996) 51 Cal.App.4th 393 is unavailing. Dependency jurisdiction there was predicated on the allegations of the petition which could not withstand the dependency equivalent of a demurrer, i.e., the failure to state a claim. The petition did not, inter alia, state a claim for failure to protect the child. (*Id*. at

Hannah, and Sariah dependents of the juvenile court pursuant to section 300, subdivisions (d) and (j), in addition to being defined by subdivision (b) of section 300.

c. *As there is ample evidence to support dependency jurisdiction over all eight children under section 300, subdivisions (b), (d), and (j), we need not address the sufficiency of the evidence to support the allegations under section 300, subdivision (a).*

In its appeal, the Department contends that the juvenile court erred in failing to find the children were described by section 300, subdivision (a). A preponderance of the evidence supports the court's findings as to section 300, subdivisions (b), (d), and (j), and so we need not address the sufficiency of the evidence to support a finding as to the subdivision (a) counts concerning severe physical abuse. "Section 300, subdivisions (a) through (j), establishes several bases for dependency jurisdiction, any one of which is sufficient to establish jurisdiction. (§ 300.)" (*In re Dirk S.* (1993) 14 Cal.App.4th 1037, 1045; see, e.g., *In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875.) There being substantial evidence to support the court's finding as to section 300, subdivisions (b), (d), and (j), the preponderance of the evidence supports the jurisdictional finding.

2. *The removal order is supported by sufficient evidence.*

Father contends there was insufficient evidence to remove the children from his custody (§ 361, subd. (c)). Father largely relies on his argument that the evidence is insufficient to support the adjudication order.

" 'After the juvenile court finds a child to be within its jurisdiction, the court must conduct a dispositional hearing. [Citation.] At the dispositional hearing, the court must decide where the child will live while under the court's supervision.' [Citation.] 'A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting

---

p. 398.) Here, as we have analyzed, the evidence supports the finding under subdivision (b) of section 300.

harm to the child." [Citation.] The court may consider a parent's past conduct as well as present circumstances.' [Citation.]" (*In re A.S.* (2011) 202 Cal.App.4th 237, 247.)

" 'Before the court issues a removal order, it must find the child's welfare requires removal because of a substantial danger, or risk of danger, to the child's physical health if he or she is returned home, and there are no reasonable alternatives to protect the child. [Citations.] There must be clear and convincing evidence that removal is the only way to protect the child.' [Citation.]" (*In re A.S.*, *supra*, 202 Cal.App.4th at p. 247; § 361, subd. (c)(1).)

Although the juvenile court must make the removal findings by clear and convincing evidence (§ 361, subd. (c)), on appeal, " ' " 'the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong.' [Citation.]" [Citation.] "We have no power to judge the effect or value of the evidence, to weigh the evidence [or] to consider the credibility of witnesses . . . ." ' [Citation.]" (*In re A.S.*, *supra*, 202 Cal.App.4th at p. 247.)

Father admits he hit his children. Indeed, he has a lengthy history of beating his children starting from when they were very young, causing serious physical harm. At this point, the children are gravely afraid of father and fear the possibility that father will either kidnap them or regain custody of them. Moreover, father is not simply beating his children; he is also sexually abusing toddlers and very young girls. The juvenile court's removal order is supported by the record here.

3. *The order limiting father's right to direct K.'s education is supported by the record*.

"Parents have a constitutionally protected liberty interest in directing their children's education. [Citations.] However, when a child is a dependent child, a court may limit a parent's ability to make educational decisions on the child's behalf by appointing a responsible adult to make educational decisions. [Citations.]" (*In re R.W.* (2009) 172 Cal.App.4th 1268, 1276, citing §§ 361, subd. (a) & Cal. Rules of Court, rule 5.650(a).)

"If the parent or guardian is unwilling or unable to participate in making an educational decision for his or her child, or if other circumstances exist that compromise the ability of the parent or guardian to make educational decisions for the child, the county welfare department or social worker shall consider whether the right of the parent or guardian to make educational decisions for the child should be limited." (§ 366.1, subd. (e).) "A court-imposed limitation on a parent's educational rights 'may not exceed those necessary to protect the child.' [Citation.]" (*In re R.W.*, *supra*, 172 Cal.App.4th at p. 1276, citing 366.1, subd. (a).)

"We review the juvenile court's order limiting parents' educational rights under an abuse of discretion standard [citation], bearing in mind '[t]he focus of dependency proceedings is on the child, not the parent' [Citation.]" (*In re R.W.*, *supra*, 172 Cal.App.4th at p. 1277.)

Here, father challenges the order limiting his rights to make educational decisions for K. and appointing R. in father's stead. He argues he told the court that he was unable to participate in K.'s IEP because he broke his foot. Yet, the court was not required to believe father's justification for failing to appear at K.'s IEP. Given (1) father's history of keeping his children out of school; (2) refusing to participate in the IEP process, even to simply sign the authorization to commence the IEP; (3) his declaration that he did not agree with an IEP; and (4) his conduct that delayed services for Catherine, the court did not abuse its discretion in concluding father was unwilling or unable to participate in making educational decisions for K. and in limiting his ability to make such educational decisions for that child. (§ 366.1, subd. (e).)

4. *The ICWA*

Father challenges the juvenile court's finding the ICWA does not apply.

a. *The factual background*

Two maternal aunts told the court they had Shoshone heritage through the great or great-great grandmother. The court asked the aunts to investigate and provide the social worker with all the information they could obtain. By the time of the adjudication hearing, the maternal aunts had undertaken an ancestry check based on old family photographs. One aunt thought there was a probability of Indian heritage through older relatives, but she had no idea through whom that lineage existed or what tribe held the potential affiliation. The aunt confirmed her family was *not enrolled nor was eligible for enrollment* in a tribe.

Father stated in September 2012 he was part Creek and Sioslaw. When he submitted his parental notification of Indian status in October 2012, father checked the box indicating he had *no Indian ancestry* as far as he knew. At the same time, father indicated to the juvenile court he had Indian heritage but "[i]t would take me a while to find the number. . . ." and he "would have to go to Ancestor's.com . . . to find it." The court then explained that the statute had been amended to define " 'reason to know' " and that pursuant to this definition, the court stated it "does not have reason to know that the children are Indian children as defined under ICWA and does not order notice to any tribe or the B.I.A. [Bureau of Indian Affairs (BIA)] with regards to [father]."

Notwithstanding the juvenile court's finding, the Department attempted to investigate. The social worker inquired of father again. He indicated that he went on the website, ancestry.com and discovered he had Indian heritage through the Creek and Sallisaw tribes. The paternal uncle indicated the family may have Choctaw and Cherokee lineage. At father's request, the Department e-mailed father the ICWA form with instructions on how to fill it out and return it to the Department.

Father never filled out the ICWA form. The social worker made an unannounced visit to father's house on October 26, 2012 to ask for the ICWA form and information. Father claimed he was in the process of obtaining the information. The social worker

15

asked for whatever information father had already gathered, but he refused to reveal what he already knew, preferring to wait until he had received all of the information. He did promise to provide the social worker with any known family lineage.

At the time the Department filed its November 27, 2012 status report for the adjudication hearing, it had received *no* information about father's Indian ancestry to provide the court and so it had no family lineage information for purposes of mailing out notices.

b. *Application*

" 'The ICWA is designed to protect the interests of Indian children, and to promote the stability and security of Indian tribes and families. It sets forth the manner in which a tribe may obtain jurisdiction over proceedings involving the custody of an Indian child, and the manner in which a tribe may intervene in state court proceedings involving child custody." (*In re Z.N.* (2009) 181 Cal.App.4th 282, 297.) The "ICWA 'requires [the Department] to notify '*the Indian child's tribe*' of the proceedings if 'the court knows or has reason to know that an Indian child is involved.' (25 U.S.C. § 1912(a).)" (*In re Marinna J.* (2001) 90 Cal.App.4th 731, 736-737, italics added.)[4]

Father claims that he gave the juvenile court sufficient information about his claimed connection to the Shoshone or Creek tribes to trigger the notice requirements of title 25 United States Code section 1912(a). Father also mentioned the Sallisaw or Sioslaw tribes.

The ICWA requires notice be given to federally recognized Indian tribes. (25 U.S.C. § 1903(8).) A federally recognized Indian tribe is an entity that is eligible for the services of the Department of the Interior as listed in the Federal Register.

---

**4** Title 25 United States Code Service section 1912(a) provides "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian *and the Indian child's tribe*, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention." (Italics added.)

(25 U.S.C. § 1903(8); 77 Fed. Reg. 47868 (Aug. 10, 2012); accord, § 224.1.)[5] [6] The Sallisaw tribe is not a federally recognized tribe eligible to receive services from the BIA. (77 Fed. Reg., *supra*, at p. 47871.)

Father also claims that the juvenile court received sufficient information about the children's Indian ancestry through their mother to trigger the notice requirements. However, in *In re Z.N.*, *supra*, 181 Cal.App.4th 282, the mother believed that one of her grandmothers " 'was Cherokee' and another 'part Apache' " (*id.* at p. 298), but indicated she was not registered and "[did] not believe her mother established any affiliation." (*Id.* at p. 297.) The appellate court there held that "[w]hatever the status of the grandmothers, they were great-grandmothers of the twins, and this information did not suggest that the twins were members or eligible for membership as children of a member." (*Id.* at p. 298.) Consequently, this information "did not trigger a duty to notify tribes." (*Ibid.*)

Likewise, here, the maternal aunts thought it was likely there was Indian heritage through "older relatives," but they did not know through whom the lineage ran or with what tribe they were affiliated. Moreover, the mother's family was *not enrolled nor was eligible for enrollment* in a tribe. As with *Z.N.*, whatever the status of the family members, this information does not indicate the children here are members or even eligible for membership as children of members and so the notice requirements were not triggered. (*In re Z.N.*, *supra*, 181 Cal.App.4th at p. 298.)

Furthermore, given the information provided by both sides of these children's family, it would be impossible for the Department to satisfy ICWA's notice requirements.

---

**5**     Section 224.1 reads, "(a) As used in this division, unless the context requires otherwise, the terms 'Indian,' 'Indian child,' 'Indian child's tribe,' 'Indian custodian,' 'Indian tribe,' 'reservation,' and 'tribal court' shall be defined as provided in Section 1903 of the Indian Child Welfare Act (25 U.S.C. Sec. 1901 et seq.)"

**6**     25 United States Code section 1903(8) reads in relevant part, " 'Indian tribe' means any Indian tribe, band, nation, or other organized group or community of Indians recognized as eligible for the services provided to Indians by the Secretary because of their status as Indians . . . ."

17

Section 224.2 requires the Department to notify the tribe *and the BIA* of, inter alia, "(A) The name, birthdate, and birthplace of the Indian child, if known. [¶] (B) The name of the Indian tribe in which the child is a member or may be eligible for membership, if known. [¶] (C) All names known of the Indian child's biological parents, grandparents, and great-grandparents, or Indian custodians, including maiden, married and former names or aliases, as well as their current and former addresses, birthdates, places of birth and death, tribal enrollment numbers, and any other identifying information, if known." (§ 224.2, subd. (a)(5).) Father has yet to provide the Department with *any* such information. Accordingly, remand with an order to the Department to send empty notices to random tribes and the BIA would constitute an idle act. The law does not require idle acts. (*In re Vincent S*. (2001) 92 Cal.App.4th 1090, 1093-1094, cert. den. *Stafford v. Los Angeles County Department of Children and Family Services* (2002) 537 U.S. 837, citing Civ. Code, § 3532.)

DISPOSITION

The orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, J.

We concur:

KLEIN, P. J.

KITCHING, J.