Filed 10/30/15  In re Cheyenne R. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re CHEYENNE R., a Person Coming Under the Juvenile Court Law. | |
| TUOLUMNE COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>D.C.,<br><br>Defendant and Appellant. | F071314<br><br>(Super. Ct. No. JV7498)<br><br>**OPINION** |

APPEAL from orders of the Superior Court of Tuolumne County.  Donald I. Segerstrom, Jr., Judge.

Linda K. Harvie, under appointment by the Court of Appeal, for Defendant and Appellant.

Sarah J. Carrillo, County Counsel, for Plaintiff and Respondent.

-ooOoo-

D.C. (mother) appeals from a March 24, 2015, order terminating parental rights (Welf. & Inst. Code, § 366.26)[1] to her one-year-old daughter Cheyenne. Mother contends the juvenile court's order must be reversed because (1) the juvenile court and the Tuolumne County Department of Social Services (Department) failed to comply with the notice provisions of the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.), and (2) violated her constitutional and statutory due process rights because the Department did not mail notice of the section 366.26 hearing to the address she had on file. Finding no reversible error, we affirm the termination order.

## FACTUAL AND PROCEDURAL BACKGROUND

Cheyenne first came to the Department's attention at her birth in March 2014[2] when the Department received a referral alleging mother, who had been randomly drug testing through the probation department, admitted to using methamphetamine during her pregnancy. Mother told the investigating social worker she had used methamphetamine one month before Cheyenne's birth, and to avoid methamphetamine use, she needed to be in a structured drug treatment program and randomly drug tested. Mother had been participating in a court-ordered behavioral intervention program, which included at least twice weekly random drug testing and individual counseling. Mother told the social worker she planned to live in the home of B.R.,[3] as his home was stable and drug free, and to continue to participate in her behavioral intervention program. The Department found the allegation of general neglect unfounded, as during the investigation mother's

---

[1]Undesignated statutory references are to the Welfare and Institutions Code.

[2]Subsequent references to dates are to dates in 2014 unless otherwise stated.

[3]B.R. is the father of mother's two older children, B.R., Jr. and J.R. In 2004, then six-month-old B.R., Jr. became a dependent of the juvenile court based on his parents' use of heroin while he was in their custody. The parents were ordered into the dependency drug court program, but they did not comply with their case plans and failed to reunify with B.R., Jr. Parental rights over B.R., Jr. were terminated in 2006. J.R., born in 2008, lived with her father, B.R.

drug tests were negative, she appeared appropriately bonded to Cheyenne, and she was staying with B.R.

On June 9, the Department received a referral alleging mother had been arrested that day on methamphetamine charges after testing positive for methamphetamine and admitting its use while on probation. Mother told her probation officer Cheyenne was at her home with her boyfriend, Nathaniel C., and Nathaniel's niece. There were concerns for Cheyenne's safety, as mother was unable to make long-term arrangements for Cheyenne before her arrest, and she had deviated from her safety plan by using methamphetamine and not providing Cheyenne with a stable living environment.

Over the next three weeks, social workers joined with mother's probation officer to try to locate mother and Cheyenne. They were not found at multiple addresses mother had supplied to her probation officer. On July 2, the probation officer told a social worker she had met with mother the day before; mother told the probation officer she was staying at an address on Racetrack Road and people who work at the "Heart Rock Café" were watching Cheyenne during the day. Mother did not know the last names of those people or their addresses. Mother also said people who lived "somewhere on Columbia Way" also babysat Cheyenne, but mother did not know their last names.

The Department filed a dependency petition on July 2, which alleged Cheyenne came within the provisions of section 300, subdivisions (b), (g) and (j), based on mother's methamphetamine use, her admission that she often left three-month-old Cheyenne in the care of people whom she could not identify or determine to be appropriate caregivers, the unknown whereabouts of Cheyenne's alleged father Rodney K.,[4] and B.R., Jr.'s prior dependency case. The juvenile court signed a protective custody warrant, which social workers and sheriff's deputies attempted to serve at the last

_____

[4]Paternity testing revealed Rodney is Cheyenne's biological father. Rodney declined to participate in the case, however, and he is not a party to this appeal.

address at which mother claimed to be residing. The homeowner, Katina P., told them mother and Nathaniel had been staying there but they left with Cheyenne earlier that day.

On July 7, mother called the social worker because she had learned the Department was trying to contact her. Mother admitted she had "'slipped up'" and used methamphetamine in June, but claimed it was only "'that one time.'" Mother said she had been testing through the probation department in the behavioral intervention program. Mother stated she did not have a stable residence and she was staying with Katina P. Mother brought Cheyenne into the Department the next day. Cheyenne, who appeared to be clean and healthy, was taken into protective custody pursuant to the warrant.

On July 10, the Department filed an amended petition adding Nathaniel as a second alleged father.[5] In the report prepared for the detention hearing, the social worker noted ICWA does or may apply, and the parents would be questioned regarding their American Indian ancestry. The social worker explained mother had claimed to have Cherokee Indian heritage in the November 2004 dependency case, but after notices were sent to all federally recognized Cherokee Indian tribes, it was found that mother was not an enrolled member or eligible for enrollment in any of them. At the July 10 detention hearing, at which mother appeared, the juvenile court ordered Cheyenne detained and set a jurisdictional hearing for July 29. The juvenile court also found Cheyenne may be an Indian child as defined by ICWA.

On July 24, mother completed and signed an ICWA-020 form, entitled "Parental Notification of Indian Status," on which she indicated she may have Navajo, Cherokee

---

[5]Although paternity testing ruled out Nathaniel as Cheyenne's biological father, Nathaniel attempted to elevate his paternity status to that of a presumed father on the ground that he had received Cheyenne into his home and held her out as his own. After a hearing on the issue, the juvenile court found he failed to establish the presumption applied. Accordingly, Nathaniel remained an alleged father and was denied reunification services on that basis. He is not a party to this appeal.

and Southern Mi-Wuk Indian ancestry.  Mother was directed to complete and submit the "American Indian Ancestry Questionnaire" ICWA-030 form by July 29.

On July 29, the jurisdictional hearing was continued to August 19 for compliance with ICWA, as mother failed to submit the ICWA-030 form.  Mother was ordered to provide the information.  On July 31, mother told a legal clerk with the Department that she was meeting with a representative at the local reservation regarding completing the ICWA questionnaire and she would submit the completed form by August 5.  Mother, however, failed to submit the form.  Also on July 31, mother filed a form JV-140, "Notification of Mailing Address," on which she listed her mailing address as being on Coopers Court in Sonora.  According to the social worker, the home where mother and Nathaniel were living was reported to be owned by a registered sex offender.

On August 7, mother came to the Department for a scheduled visit, but said she forgot the ICWA-030 form.  Thereafter, the social worker left two voicemail messages for mother, asking her to submit the form.  On August 14, mother reported to the Department for a scheduled visit.  When asked about the form, mother said she had not been able to meet with the tribe representative to obtain assistance with completing the form because he was not available at the time of the appointment, but she had another appointment scheduled.  The social worker told mother to submit the form the next day, but she failed to do so.

At the August 19 hearing, the juvenile court was told that another continuance was necessary because mother had not filled out the ICWA form.  Mother was ordered to remain outside the courtroom and meet with the social worker to fill out the form and provide the requested information.  The jurisdictional hearing was continued to September 2.

The ICWA-030 form was completed on August 20.  It states that Cheyenne is or may be eligible for membership in the Cherokee, Mi Wuk, or Choctow tribes.  Mother provided the names of her relatives, including:  her mother, her father Paul D., her

5.

grandmother, and her grandfather Bill K. The form also lists, under the heading "Mother's Biological Grandfather," "Franklin P[.] (Great Great Grandfather)," and identifies his tribe or band as "Mi Wuk, Cherokee." On the lines for Franklin P.'s current and former addresses, places and dates of birth and death, and tribal membership or enrollment number, is written "Asked[,] no response." Under an area on the form that lists "optional questions" which "may be helpful in tracing the ancestry of the child," "Franklin P[.] Great-Great Grandfather" is identified (1) as a family member who has "[l]ived on federal trust land, a reservation or Rancheria, or an allotment" in Cherokee, Oklahoma, and (2) as being listed on the "1906 Final Roll." On August 20, the Department sent the ICWA-030 to 16 tribes and the Bureau of Indian Affairs.

On August 26, mother told the social worker the ICWA-030 was not accurate as she had reported it. The form was amended to add the possible tribal affiliation for the child's maternal grandfather, Paul D., as Cherokee or Choctaw, where that space had previously been blank. The corrected ICWA-030 was sent to the same 16 tribes and the Bureau of Indian Affairs on August 27.

At the September 2 hearing, county counsel asked for a continuance since the tribes were recently renoticed due to the new information from mother. County counsel also asked the juvenile court to order mother to review the form with her attorney to make sure it was correct. The juvenile court stated the parents needed to understand that the Department must have proper information because it has to give notice to the right tribes. Nathaniel interjected that "[t]he information is coming from [mother]'s father. They didn't mark her grandfather down. She marked it down on the paperwork, but they didn't put it in their paperwork." The juvenile court asked Nathaniel whether he was there when that happened. Nathaniel answered, "[t]hey didn't mark down her grandfather. It was her dad—they didn't mark down her father." The juvenile court asked if they gave that information to someone at social services. Mother responded, "I showed them at the window and I left a message. I left a message about the misprint on

6.

the paperwork." County counsel added that he understood the Department had the correct information. The juvenile court then continued the hearing to September 23 for ICWA compliance.

In September 2014, the Department received responses from three federally recognized Cherokee tribes. Both the August 28 and September 9 letters from the Cherokee Nation listed the names of the maternal relatives mother provided in the ICWA-030 form, including Franklin P. The letters stated the tribe's "Indian Child Welfare" had examined the tribal records regarding the above-name child, Cheyenne, none of the names provided could be found as current enrolled members, and therefore Cheyenne did not meet the definition of "Indian child" in relation to the Cherokee Nation as stated in ICWA, 25 United States Code section 1903(4). The letter advised that "[a]ny incorrect or omitted information could invalidate this determination," and because "enrolled tribal member" and "eligible for enrollment" are different, "a conclusive finding of 'eligible for enrollment' requires the full names, to include maiden names, and dates of birth for the direct biological lineage linking the child to an enrolled member of the tribe. It is impossible to validate or invalidate a claim of Cherokee heritage without this information." The letters further stated that if the Department wished to send additional information, it should respond in writing with the additional lineage.

The September 8 and 14 letters from the Eastern Band of Cherokee Indians stated the tribes' tribal registry had been reviewed and, based on the information received from county counsel, Cheyenne was neither registered nor eligible to register as a member of the tribe and therefore was not considered an Indian child in relation to the tribe. Finally, the September 5 letter from the United Keetoowah Band of Cherokee Indians in Oklahoma stated it had searched the tribe's enrollment records with the information the Department supplied, and there was no evidence Cheyenne was a descendent of anyone on the Keetoowah roll.

The Mississippi Band of Choctaw Indians also submitted responses in September 2014. The first, a September 2 letter from the tribal enrollment officer to the attorney general for the tribe, stated the tribe's enrollment records had been researched "for the information you provide[d] to us for the following individual(s)," and specifically listed Cheyenne, mother, Bill K. and Nathaniel. The letter further stated these individuals are not enrolled members of the tribe or eligible for enrollment. The second, a September 23 letter from the tribal enrollment officer to the tribe's attorney general, listed the same names, added the name of Paul D., and stated that none of the listed individuals were an enrolled member of the tribe or eligible for enrollment. [6] Neither letter listed Franklin P.'s name.

The jurisdictional hearing was continued to October 2, since mother requested a contested hearing. Mother and Nathaniel both testified at the jurisdictional hearing, as did mother's probation officer. With respect to mother's living situation, the probation officer testified Nathaniel's parents live in Groveland. Mother had been living on Coopers Court in Sonora, although the probation officer had never seen her there. The probation officer knew mother had just been asked to leave, and while mother told the probation officer she was living in Groveland, the officer had not verified that.

Mother testified that at the time of the hearing she was living "off of" Coopers Court, but she and Nathaniel were not going to be living there much longer. The two were looking for another place to live and hoped they would get into a house within a few days, or at most within two weeks. On weekends, from Friday to Sunday, she lived in Groveland. Mother and Nathaniel got married on July 17. In March 2014, Nathaniel was living with Katina P., who is mother's father's adopted brother's ex-wife, and her parents

---

[6]The attorney general for the tribe forwarded these letters to the Department as an enclosure to letters dated September 12 and 24. In the September 12 and 24 letters, the attorney general stated that since the listed individuals were not enrolled with the tribe or eligible for enrollment, his office would not be intervening in the case.

in the house on Coopers Court. A few months later, mother and Cheyenne moved into that same house.

After argument by the parties, the juvenile court found the petition's allegations true and set a dispositional hearing for October 14.

In its report prepared for the dispositional hearing, the Department recommended no services be offered to mother pursuant to section 361.5, subdivision (b)(10), (11) and (13), as mother had an extensive history of drug related criminal charges and substance abuse, had been court-ordered to participate in a number of drug treatment programs between 2004 and 2014, and despite these services, she continued to abuse methamphetamine and alcohol. The Department requested a continuance, however, as it was waiting to receive criminal records it had requested on Nathaniel from Tennessee, where he had lived for seven years. The Department further reported with respect to ICWA that all appropriate tribes had been noticed and letters had been received from nine tribes indicating Cheyenne was neither a member nor eligible for membership.

On October 8, social workers made an unannounced visit to Nathaniel and mother's last known address. A man who identified himself as Katina P.'s father answered the door and told the social workers he asked the couple to move out five days before because he believed they had stolen jewelry from the home. Katina told the social workers she last heard from Nathaniel on October 5; she believed the couple was homeless and camping out.

Nathaniel told the social workers during a psychosocial interview on October 9 that while he and mother had been living with Katina P. and her parents, they left the home shortly after the jurisdictional hearing because they were accused of stealing. He and mother were staying in Groveland on a ranch belonging to the parents of a friend named Matt, but paid for a hotel in Sonora during the week while mother attended her behavioral intervention classes.

On October 14, the juvenile court continued the hearing for two weeks, to October 21 for a determination of Nathaniel's paternity status and set a contested dispositional hearing for November 19. Neither mother nor Nathaniel appeared on October 21, when the juvenile court found Nathaniel did not establish presumed father status.

Mother was present at the November 19 contested dispositional hearing. She testified she had moved into a three-bedroom, two-bath house in Sonora, which was a more permanent home for them. She and Nathaniel lived in the house with Sylvia P. and her roommate, Cliff. Mother and Nathaniel had been in the house about a week. On weekends when mother did ranch work, she lived in Groveland. Before living at these addresses, she was living on Coopers Court with Katina and her parents.

Nathaniel also testified at the hearing. He confirmed that he and mother lived in Sonora and they stayed in Groveland during the weekends. Sylvia P. wrote a letter in support of mother and Nathaniel in which she listed her mailing address as 13775 A Mono Way P.M.B. 190, Sonora, CA, 95370. Nathaniel was asked why Sylvia P.'s letter had an address on Mono Way, which was different from their address. Nathaniel said that was her "P.O. Box" where she got her mail.

After oral argument, the hearing was continued to November 25 for the juvenile court's ruling. Mother and Nathaniel both attended the November 25 hearing. The juvenile court denied services to both of them and advised them of their right to take a writ from its decision. The juvenile court stated it was setting the selection and implementation hearing pursuant to section 366.26 for April 7, 2015, and it was signing the order in open court. The juvenile court asked if there was anything further; all counsel responded "no." After the court said that would be the order, county counsel pointed out the hearing had to be held within 120 days. The juvenile court responded, "Get them back. I'm sorry. You want—instead of the 31st it has to be the 24th?" After some discussion with county counsel, Cheyenne's attorney, and the court clerk, the

10.

juvenile court stated: "So that hearing date I just set of April 7, I'm going to vacate that date and set it for March 24, 2015. March 24, 2015 at 8:00 a.m. in Department One. That doesn't change the dates—the time within which you have to file your writ if you want to seek judicial review." Nathaniel responded, "Thank you, Your Honor." The juvenile court then stated, "All right. That will be the order."

The minute order of the hearing reflects mother was present for the hearing, lists March 24, 2015, as the date of the section 366.26 hearing, and states the parents were advised of their rights to file a writ to seek appellate review of the setting of the section 366.26 hearing and were handed a notice of intent to file the writ. The written order the juvenile court signed in open court also states mother was present for the hearing and lists March 24, 2015, as the date of the section 366.26 hearing.

On November 26, mother filed a "Notice of Intent to File Writ Petition." For her address, the address in Groveland was written, but then crossed out, and underneath was written "13775 A Mono Way P.M.B. 190, Sonora 95370."[7] Nathaniel also filed a notice of intent on November 26 listing the same address.

On January 14, 2015, a proof of service from the Department, dated January 12, 2015, was filed which stated that notice of the March 24, 2015, hearing on selection of a permanent plan was sent to mother by certified mail in care of Sylvia P. to the address on Mono Way. On March 19, 2015, a proof of service from the Department, dated March 18, 2015, was filed, which stated the "366.26 WIC Report," case plan, and health and education passport, was also sent to mother at the Mono Way address in care of Sylvia P.

The social worker's report prepared for the section 366.26 hearing stated that one-year-old Cheyenne was healthy and developmentally on track. Since being taken into protective custody, Cheyenne had been in the same foster home. The foster parents were

---

[7]Although mother filed the notice of intent, she never filed a petition with this court and we dismissed the matter as abandoned on January 13, 2015, in case No. F070552.

11.

very committed to Cheyenne and wanted to adopt her. The Department and the California Department of Social Services conducted a joint assessment and concurred that Cheyenne would likely be adopted if parental rights were terminated, and adoption would provide her with the highest level of stability and be in her best interest. There was no evidence that termination of parental rights would be detrimental to Cheyenne. Since disposition, mother had participated in monthly visits and told the social worker she would provide the foster parents with a family photograph album for Cheyenne.

The Department recommended the juvenile court find that ICWA did not apply. The Department had received several more letters from the noticed tribes that stated Cheyenne was not a member or eligible for membership in their tribes. Several tribes had not yet responded, but more than 60 days had elapsed since the notices were sent. The Department also recommended the juvenile court terminate parental rights and order a permanent plan of adoption.

Mother did not appear at the March 24 section 366.26 hearing, although her attorney was present. The juvenile court asked the social worker if she had any contact with mother. The social worker replied she had last seen mother at mother's visit on March 3, 2015. The juvenile court asked if mother was aware of the hearing for that day. The social worker responded: "She was. She was also trying—still trying to pursue appealing the last Court's decision." County counsel submitted on the report and recommendation. Mother's attorney stated he would "[s]ubmit." The juvenile court found all notices had been given as required by law, Cheyenne was not an Indian child pursuant to ICWA, and there was clear and convincing evidence Cheyenne was likely to be adopted. The juvenile court terminated parental rights and chose adoption as the permanent plan.

This appeal followed. In the notice of appeal, signed by mother's attorney, mother's address is listed as the one on Coopers Court.

## DISCUSSION

### 1.     ICWA Compliance

"Congress enacted ICWA to further the federal policy '"that, where possible, an Indian child should remain in the Indian community …."'" (*In re W.B., Jr.* (2012) 55 Cal.4th 30, 48.)  "In certain respects, California's Indian child custody framework sets forth greater protections for Indian children, their tribes and parents than ICWA. [Citations.]  Both federal and state law expressly provide that if a state or federal law provides a higher level of protection to the rights of the parent or Indian guardian of an Indian child, the higher standard shall prevail." (*In re Jack C.* (2011) 192 Cal.App.4th 967, 977.)

"ICWA requires that when a court knows or has reason to know that an Indian child is involved in a dependency matter, it must ensure that notice is given to the relevant tribe or tribes." (*In re J.O.* (2009) 178 Cal.App.4th 139, 154.)  ICWA defines an "Indian child" as an "unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe …." (25 U.S.C. § 1903(4).)  However, "[t]he juvenile court '"needs only a suggestion of Indian ancestry to trigger the notice requirement."'" (*In re J.M.* (2012) 206 Cal.App.4th 375, 380.)

> "Under the implementing federal regulation, the required ICWA notices must include '[a]ll names *known*, and current and former addresses of the Indian child's biological mother, biological father, maternal and paternal grandparents and great grandparents or Indian custodians, including maiden, married and former names or aliases; birthdates; places of birth and death; tribal enrollment numbers, and/or other identifying information.' [Citation.]  California law requires that the notices contain substantially the same data, including 'any other identifying information, *if known.*'" (*In re C.B.* (2010) 190 Cal.App.4th 102, 140, first italics added, some italics omitted.)

"'The [trial] court must determine whether proper notice was given under ICWA and whether ICWA applies to the proceedings.  [Citation.]  We review the trial court's findings for substantial evidence.'" (*In re Christian P.* (2012) 208 Cal.App.4th 437,

13.

451.) Substantial evidence is evidence which a reasonable trier of fact could find to be proof of a contested factual issue. (See generally *Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651–652.) A reviewing court must indulge all reasonable inferences that may be derived from the evidence which supports the contested ruling. (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053.)

Here, mother challenges the juvenile court's determination that proper notice was given under ICWA. She contends the Department failed to use due diligence when conducting its investigation. Specifically, she asserts the Department should have conducted an additional inquiry for information regarding her great-great-grandfather Franklin P. after receiving responses from the three Cherokee tribes and the Mississippi Band of Choctaw Indians. With respect to the Cherokee tribes, she argues the letters should have put the Department on notice the tribes needed more information concerning Franklin so they could determine whether Cheyenne was eligible for tribal membership, and the Department should have contacted either her or her father, Paul D., to obtain that information. With respect to the Mississippi Band of Choctaw Indians, she argues the Department should have recognized the tribe's responses did not list Franklin as one of the individuals the tribe researched and therefore should have contacted the tribe to ask it to conduct research on him.

On the first issue, none of the Cherokee tribes specifically asked for additional information concerning Franklin. The letters merely stated the tribes' determinations were based on the information provided, which as to Franklin included his first and last name, tribe or band, that he had lived on federal trust land or a reservation in Cherokee, Oklahoma, and that he was on the "1906 Final Roll." While the responses from the Cherokee Nation did explain that full names and dates of birth for the direct biological lineage linking Cheyenne to an enrolled member of the tribe were required for a "conclusive finding" of "eligible for enrollment," it is apparent from the letters that this was part of the form letter the tribe used and was not a request for information as to a

14.

specific individual listed on the ICWA-030 form indicating a possible match with an enrolled member.

Both the juvenile court and a social services agency have "an affirmative and continuing duty to inquire" whether a child in dependency proceedings is an Indian child. (§ 224.3, subd. (a).) Circumstances that trigger a duty to make further inquiry include receipt of information from an Indian tribe or organization which suggests the child is an Indian child. (Cal. Rules of Court, rule 5.481(a)(5)(A).)[8] Mother appears to assert the letters from the Cherokee tribes are requests for further information, and therefore they suggest Cheyenne is an Indian child. We disagree. None of the letters, including the ones from the Cherokee Nation, imply that any of the tribes believed Cheyenne might be an Indian child. Rather, the letters merely convey the message that based on the information provided, the tribes cannot determine whether Cheyenne is an Indian child and, accordingly, they conclude she is not; but if further information comes to light, the tribe would consider that information to determine the child's status. While the Cherokee Nation's letters were more specific than the others in stating what was required for the tribe to make a conclusive finding of eligibility for enrollment, they differ from the other letters only in that they explicitly state the information that will suffice to establish Cheyenne is an Indian child. They certainly do not imply the tribe believes such information exists or is obtainable.

While mother argues the Department had a duty to ask the Mississippi Band of Choctow Indians to research Franklin because the tribe's letters did not list his name, she cites no authority that imposes such a duty. As the Department points out, "'[i]t is the tribe's prerogative to determine membership criteria.'" (*In re Jack C.*, *supra*, 192 Cal.App.4th at p. 978; see § 224.3, subd. (e)(1) ["A determination by an Indian tribe that a child is or is not a member of or eligible for membership in that tribe … shall be conclusive"].) "The decision whether a child is a member of, or eligible for membership

---

[8]All further rule references are to the California Rules of Court.

in, the tribe is the sole province of the tribe." (*In re Jack C.*, *supra*, at p. 980.) "[T]he determination [of] whether the child is an Indian child within the meaning of ICWA depends in large part on the tribe's membership criteria. Because of differences in tribal membership criteria and enrollment procedures, whether a child is an Indian child is dependent on the singular facts of each case." (*Id.* at p. 979.)

The Department's obligation with regard to notice extends only to ensuring notice to the relevant tribes with the pertinent information by certified mail with return receipt requested. The Department fulfilled that obligation with respect to the Mississippi Band of Choctow Indians, as the notification sent to the tribe included the information concerning Franklin. The Department was not required to ensure the response it received met its own subjective criteria for determining eligibility for tribal membership; neither was it able to compel the sovereign tribe to provide such a response.

None of the tribes in the instant case considered Cheyenne to be an Indian child and none of them intervened. The purpose of ICWA is "'to give tribes the *opportunity* to investigate and determine whether a child is an Indian child, and to advise the tribe of the pending proceeding and its right to intervene.'" (*In re Z.N.* (2009) 181 Cal.App.4th 282, 301, italics added.) ICWA does not compel tribes to investigate and intervene in a manner dictated by states, the Department, or the parties.

Here, the record supports the inference the Department did adequately discharge its duties of notice and inquiry, and the Department was not obligated to conduct further inquiry. Moreover, there is nothing in the record to suggest that had the Department conducted further inquiry, it would have received additional information concerning Franklin. Mother asserts the record shows her father, Paul D., may have had additional information, as shown by Nathaniel's statement at the September 2, 2014, hearing that the information on Indian heritage was "coming from [mother]'s father," and while the Department presumably knew how to contact her father, the record does not demonstrate that any social worker did so. Mother argues this demonstrates the Department failed to

16.

conduct an adequate inquiry as required by section 224.3, subdivision (c),[9] and rule 5.481(a)(4).[10]

This court faced the same argument in *In re Gerardo A.* (2004) 119 Cal.App.4th 988. There, evidence in the record showed the department had spoken to the children's mother and maternal aunt about their possible Indian heritage. On appeal, the children's father argued the social workers also should have inquired of the maternal grandmother or other older maternal relatives for additional family history that was left blank on the form sent to the tribes. (*Id.* at pp. 994-995.) We rejected the argument "because it was based on speculation." (*Id.* at p. 995.) Citing to *Calhoun v. Hildebrandt* (1964) 230 Cal.App.2d 70, 72, which states it is the appellant's burden to affirmatively show error on the record, we explained that "[t]he fact that the record is silent regarding whether the department spoke with anyone other than the children's mother and maternal aunt does not necessarily mean the department failed to make an adequate inquiry for Indian heritage information." (*In re Gerardo A.*, *supra*, at p. 995.) We also concluded it was speculative to assume these other relatives were available to be interviewed or that they could have supplied the missing information. (*Ibid.*)

We reach the same conclusions here. Mother provided the information concerning her Indian heritage. There is nothing in the record to establish the Department knew or could have obtained additional information on Franklin from mother or any other family members, including her father. It is speculative to assume that mother's father was available to be interviewed or that he could have supplied the missing information.

---

[9]As relevant here, section 224.3, subdivision (c) states: "If the … social worker … knows or has reason to know that an Indian child is involved, the social worker … is required to make further inquiry regarding the possible Indian status of the child, and to do so as soon as practicable, by interviewing the parents, Indian custodian, and extended family members to gather the information …."

[10]As relevant here, rule 5.481(a)(4) states: "If the social worker … knows or has reason to know that an Indian child is or may be involved, that person … must make further inquiry as soon as practicable by: [¶] (A) Interviewing the parents … and 'extended family members' … to gather the information …."

We also reject any implication by mother that the Department should have conducted an investigation into Cheyenne's ancestry. Although a social services agency has a duty to investigate when it has reason to know that a child may be an Indian child, it has no duty to undertake a "comprehensive investigation" into a child's Indian status. (*In re C.Y.* (2012) 208 Cal.App.4th 34, 39.)[11]

In sum, substantial evidence supports the juvenile court's finding that adequate ICWA notices were provided.

## 2. Notice of the Section 366.26 Hearing

Mother contends her statutory and due process rights were violated because there is insufficient evidence that she received actual notice of the March 24, 2015, section 366.26 hearing. First, she contends there is insufficient evidence she received oral notice of the hearing date because the record does not establish she was present at the November 25, 2014, hearing when the section 366.26 hearing date was changed from April 7, 2015, to March 24, 2015. She next contends that even if she was present when the new date was set, the oral notice the juvenile court provided did not contain all of the

---

[11]Subsequent to filing her opening brief, mother filed a request asking us to take judicial notice under Evidence Code sections 451, subdivision (f), and 452, subdivision (c) of copies of (1) relevant excerpts from the 1906 Cherokee by Blood Rolls, and (2) Dawes Enrollment Card No. 6542 and the information sheet concerning that card. She asserts these documents, which her attorney obtained from various Internet Web sites, affirmatively establish that a "Frank P[.]," and his wife and two children, had applied for enrollment, and while it appeared that Frank P. was not given status as an enrolled member, his wife and two children were enrolled as members of the Cherokee Nation. She argues that "[i]f this is the correct Frank P[.], these facts actually strengthen [her] argument" and are relevant to the "critical issue" of whether "the Department and the juvenile court should have made certain additional investigation was done in this case, given the strong likelihood the minor was eligible for membership in an Indian tribe."

We decline the request because the facts mother seeks to establish through them are speculative and therefore irrelevant. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1135, fn. 1 [to take judicial notice, the matter must be relevant to a material issue].) Mother admits that she does not know if the person referred to in the documents is the "correct Frank P[.]" She does not contend that she or her father would have provided the Department with these documents had the Department asked either of them for additional information concerning Franklin. We reject any suggestion the Department was obligated to conduct independent research. She also does not appear to contend the tribe would have made a different determination had it been provided with these documents, which presumably were equally available to the tribes.

18.

information required by section 294, subdivision (f)(1).  Finally, she contends that while the Department represented on January 9, 2015, that she was mailed notice of the correct hearing date by "Certified or Return Receipt Requested," the notice was not sent to the address she provided on the JV-140 form on July 31, 2014, and there is no proof in the record she actually received the notice.

The Department contends mother received proper notice of the hearing.  The Department asserts that because the record does not indicate mother was not present in court when the juvenile court changed the section 366.26 hearing date, there is sufficient evidence from which we can conclude she received oral notice of that date.  The Department further contends it mailed notice of the hearing to the correct address, reasoning that while mother did not submit a JV-140 form with a new address, she testified she no longer lived at that address and notice was mailed to the address she put on the notice of intent.[12]

We need not decide whether notice was proper because any failure to give notice was plainly harmless beyond a reasonable doubt.  (*In re Justice P.* (2004) 123 Cal.App.4th 181, 193 ["In dependency proceedings, due process violations have been held subject to the harmless beyond a reasonable doubt standard of prejudice"].)[13]

---

[12]Along with its respondent's brief, the Department filed a motion to augment the record with the signed certified mail receipts for the notice of the section 366.26 hearing sent to mother, Nathaniel and Rodney, which the Department filed with the superior court on July 6, 2015.  The Department also asks us to take judicial notice of our own records, which it states show that documents served on mother at the Coopers Court address were returned as undeliverable.  We deny both requests, as these documents were not before the juvenile court when it determined that proper notice was provided (see, e.g., *In re Zeth S.* (2003) 31 Cal.4th 396, 413-414), and because, as we explain, we need not decide the issue of whether proper notice was provided, since any error was harmless.

[13]Mother concedes her claim is subject to harmless error analysis under the beyond a reasonable doubt standard.  The Department, however, argues we should employ a simple harmless error standard in assessing prejudice.  The weight of authority in California, however, applies the *Chapman v. California* (1967) 386 U.S. 18, 24, harmless beyond a reasonable doubt, standard in juvenile dependency proceedings where the error is of constitutional dimension.  (*In re Mark A.* (2007) 156 Cal.App.4th 1124, 1146.)  Accordingly, we apply that standard here.

19.

Here, there is nothing in the record to suggest the outcome of the section 366.26 hearing would have been any different had mother been present. "The primary issue in a section 366.26 hearing is whether the dependent child is likely to be adopted…. [¶] Once the court finds the likelihood of adoption, termination of parental rights is the preferred permanent plan absent proof that termination would be detrimental to the child's best interests." (*In re Angela C.* (2002) 99 Cal.App.4th 389, 395–396.) There is no dispute Cheyenne was adoptable: She was one year old at the time of the hearing, there were no health or developmental concerns about her, and her foster parents wanted to adopt her.

If, as here, a dependent child is likely to be adopted, the statutory presumption is that termination is in the child's best interest and therefore not detrimental. (§ 366.26, subds. (b), (c)(1); *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343-1344.) It would have been mother's burden to show termination would be detrimental under one of the statutory exceptions in section 366.26, subdivision (c)(1)(B). (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 809.) Mother does not contend that if she had been present at the hearing, she would have argued one of the exceptions to termination of parental rights applied. As the Department asserts, under the facts of this case, where Cheyenne was three months old when she was taken into protective custody, she had lived with the same foster parents during the course of the proceedings, and she had no preexisting sibling relationships, none of the exceptions to termination of parental rights were even remotely implicated.

Mother does not assert she would have raised any of these issues had she appeared at the hearing. Instead, she contends she would have objected to the adequacy of the ICWA notice and the juvenile court's resulting finding Cheyenne was not an Indian child pursuant to ICWA. But as we have already concluded, there was no error in the notices provided to the tribes, and the Department satisfied its duty of inquiry. Accordingly, even if mother had objected to the ICWA notices and finding, the juvenile court would have overruled those objections and still found Cheyenne was not an Indian child under

ICWA.  Since mother has failed to make any reasonable showing the outcome of the section 366.26 hearing would have been different had she been present, the notice errors, if any, were harmless beyond a reasonable doubt.

## DISPOSITION

The juvenile court's orders are affirmed.

_____
PEÑA, J.

WE CONCUR:


_____
HILL, P.J.


_____
LEVY, J.